PER CURIAM:
Steere Tank Lines, Inc., which transports petroleum products in Texas and in interstate commerce, is required by the Interstate Commerce Commission and state regulatory agencies to show evidence of financial responsibility for payment of accident claims. The sole issue in this case is whether the $222,000 paid by Steere in 1972, the tax year in question, was an insurance premium and hence a deductible business expense under § 162(a) of the Internal Revenue Code, 26 U.S.C.A. § 162(a), or essentially a nondeductible reserve for accident claims. Holding it to be in the nature of a reserve payment, and not an insurance premium, we affirm the district court.
In 1964, Steere entered into an agreement with Tri-State Insurance Company, which denominates Steere as the “principal” and Tri-State as the “surety.” Under that agreement, Tri-State provides Steere with an evidence of financial responsibility bond, but Steere agrees to indemnify TriState for all claims against it. The terms of the agreement are such that, effectively, the only risk Tri-State has is if Steere becomes insolvent.
Steere is obligated to pay two premiums to Tri-State each year. Steere paid a premium based upon a percentage of its gross revenues, with the minimum annual premium to be $6,000, for Tri-State’s providing the evidence of financial responsibility. This premium was nonrefundable. In addi *280 tion, Steere agreed to make payments into the “contract premium account.” These payments, based upon a larger percentage of its gross revenues, amounted to $222,000 for 1972. It was from the contract premium account that claims against Steere were to be paid. Any excess amounts paid into the account over amounts paid out for claims and administrative costs are returned to Steere after six years (representing the maximum statute of limitations period for tort claims). Thus, every cent paid into the contract premium account could be returned to Steere if no claims were brought against it.
After a bench trial in the United States District Court for the Northern District of Texas, District Judge Robert Hill ruled that the agreement “failed to demonstrate the ordinary indicia of a legitimate insurance arrangement,” since it neither shifted the risk of loss to Tri-State nor involved a genuine pooling of risk. He therefore held that the $222,000 paid into the contract premium account by Steere was not deductible as an expense in 1972. He did, however, allow Steere to deduct the $114,000 paid out of that account in 1972 to settle claims against Steere.
We affirm on the basis of Judge Hill’s opinion, annexed hereto as an appendix, which sets out the facts of this case in greater detail.
In its briefs and oral argument before this Court, Steere has relied heavily on the Eighth Circuit opinion in United States v. Weber Paper Co., 320 F.2d 199 (8th Cir. 1963). In that case, several businesses which were unable to get flood insurance set up a reciprocal, inter-insurance plan, under which they paid yearly premiums to a corporation they set up for that purpose. Payments for losses were made, pro rata, from the fund composed of all subscribers’ premiums. If a subscriber withdrew from the plan, up to 99% of its premium payments could be returned if no losses had been paid out of the common fund. The Eighth Circuit held the premiums paid under this plan to be deductible business expenses.
The Government asserts that Weber was wrongly decided. Compare Rev.Rule 60-275, 1960-2 Cum.Bull. 43. We need not decide whether we would follow Weber, because we find it to be distinguishable from the present case. In Weber, a subscriber’s premium payment would be used to pay flood losses suffered by other subscribers. Thus, there was an element of risk shifting to the insurer, which in turn distributed that risk of loss among all subscribers. Risk shifting or risk distribution is one of the requisites of a true insurance contract. In the present case, there was no shifting of the risk, since Steere was obligated to pay all losses. The premium contract account could be used only to pay losses suffered by Steere or its owner-lessors, but Steere was obligated to pay premiums for its owner-lessors, so in effect, Steere’s losses were to be paid only out of a fund made up of premiums Steere had paid. Thus, there was no risk distribution by Steere either.
In addition, we note one additional fact which indicates that this was not an insurance arrangement. ICC regulations provide that in order to engage in interstate commerce within a state which requires a motor carrier to maintain evidence of bodily injury and property damage liability security, the carrier must file with that state either “[1] a currently effective certificate of insurance or [2] surety bond.” 49 C.F.R. § 1023.51 (1976). The regulations require the certificate or bond to follow the forms set out in the regulations. See 49 C.F.R. §§ 1023.52 — .53 & Forms E & F (certificate of insurance); id. § 1023.54 & Form G (surety bond). Steere filed a surety bond and not a certificate of insurance with the ICC and the appropriate Texas state agency. This lends additional support to the conclusion that the $6,000 payment was the premium required for the evidence of financial security (surety bond), and the $222,000 payment was in the nature of a reserve for payment of any claims against Steere.
AFFIRMED.
*281 APPENDIX
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(Number and title omitted)
(Filed: June 15, 1976)
This cause came on for hearing before the Court without a jury, the Honorable Robert M. Hill, United States District Judge, presiding. After considering the evidence and the arguments of counsel, the Court makes the following findings of fact and conclusions of law.

Findings of Fact

1. The plaintiff, Steere Tank Lines, Inc. (Steere) seeks a tax refund of $50,197.32 from the defendant, United States of America (government) for Steere’s fiscal year ending February 29, 1972.
2. Steere is a Texas corporation with its principal place of business in Dallas, Texas which is engaged in the business of transporting petroleum products in Texas and other states and in interstate commerce.
3. The issue before the court is whether $222,092.07 Steere allegedly paid for insurance expenses in fiscal year 1972 is a deductible business expense as that term is defined in § 162(a) of the Internal Revenue Code, 26 U.S.C. § 162(a). The issue of deductibility in this case turns on whether Steere’s insurance arrangement and payments pursuant to that arrangement are characterized as fixed and definite payments or deposits to a reserve account. The government characterizes Steere’s insurance arrangement as essentially self-insurance. Steere characterizes this arrangement as a form of retrospective insurance policy. Steere further argues that this arrangement was the only means available to it to obtain adequate and necessary insurance protection. Steere therefore says a valid business necessity or purpose justifies the unusual nature of its insurance arrangement.
4. Proper characterization of Steere’s insurance arrangement is controlled by its agreements with a company called Adjustment and Inspection Company (A & I) and the ostensible insurer, Tri-State Insurance Company of Tulsa, Oklahoma (Tri-State). The parties have stipulated that these agreements governed the parties’ rights and their actions conformed to the agreements.
5. The Interstate Commerce Commission and state regulatory agencies require Steere to be properly insured against accident claims arising from the operation of its trucks in such states and in interstate commerce.
6. Prior to 1959 Markel Insurance Company carried Steere’s liability insurance coverage. Markel cancelled Steere’s coverage in 1959 due to Steere’s continued adverse claims experience.
7. Tri-State agreed to provide the I.C.C. and other agencies with the evidence of financial responsibility required by those agencies pursuant to an agreement executed between Tri-State and Steere on March 1,1964. The agreement, as amended in 1968, governed the parties’ insurance arrangement for the tax year in question.
8. The agreement between Tri-State and Steere was designed to limit any danger of liability to Tri-State except as a surety. The contract effectively limits TriState’s risk of liability to a risk of Steere’s insolvency. Among the many provisions designed to so limit Tri-State’s risk was the one in which Steere agreed to fully indemnify Tri-State against any loss. Steere also agreed to defend Tri-State against any legal actions arising from the parties’ agreement, an arrangement that reverses the ordinary insurance agreement. Further, the agreement obligated Steere to obtain and carry excess insurance.
9. The agreement provided that Steere pay two premiums to Tri-State. For providing the evidence of financial responsibility, Steere agreed to pay Tri-State a premium based upon a percentage of Steere’s gross revenues with the minimum annual premium to be $6,000.00. (paragraph 4 of agreement) Secondly, Steere agreed to pay a premium to fund two accounts with Tri *282 State. The first of these accounts was a permanent premium advance of $60,000.00. The second account was the contract premium account into which Steere agreed to make payments based upon a percentage of its gross sales. There was no evidence to indicate the basis upon which the parties negotiated the percentage. It was from this latter account that Steere was to satisfy any claims that might arise against it.
10. Tri-State possessed contractual rights designed to protect it against the possibility that Steere’s insurance claims would exceed the funded contract premium account. As previously noted, the agreement obligated Steere to make regular payments into the contract premium account on the basis of Steere’s gross revenues. Additionally, Steere was obligated, regardless of the regular payments, to maintain the account at a level at least equal to the total amount of Steere’s accident claims. Tri-State could cause Steere to replace or add securities to the contract premium account if the value of securities deposited therein became impaired. Steere was obligated to notify Tri-State of all withdrawals from the account, and Tri-State had the right to inspect all of Steere’s files and records. The surety assumed the defense of any bankruptcy action taken against Steere.
11. Contemporaneous with the agreement with Tri-State, Steere signed an agreement with Adjustment and Inspection Company (A & I) which had the effect of shifting to A & I the normal insurance duties of investigating, adjusting, settling or defending claims. A & I also served as a safety inspector and advisor for Steere. It undertook the management of the contract premium account. Profits from investment of the funds in the contract premium account were paid to A & I.
12. A & I was owned by trusts established for the benefit of the children of Bruce and David Steere, each of whom owned fifty percent (50%) of Steere Tank Lines. Bruce Steere was president and chief executive officer of both A & I and Steere.
13. Universal Agency was Tri-State’s agent for the Steere account. John Dorsey, who owned and ran Universal Agency, was vice-president of A & I and the person most directly responsible for A & I’s operation. Universal received a premium for the $6,000 to $7,000 paid by Steere to Tri-State for Tri-State’s posting a surety bond with the I.C.C. Universal did not receive a premium for Steere’s payments into the contract premium account although the payments into the account were paid to Universal which forwarded them to A & I.
14. Steere’s agreement with Tri-State provided that any excess amount paid into the premium contract account over amounts paid out for claims and administrative costs would be returned to Steere after the passage of six years.
15. Steere provided insurance coverage through the premium contract account for the trucks which it leased from independent contractors. Payments for this coverage were deducted from the lease payments.
16. In fiscal year 1972 Steere paid $114,-422.46 from the premium contract account for claims and related expenses.
17. There was no evidence in the record to indicate whether Tri-State reported the payments made into the premium contract account as income to it.
18. Steere is an accrual basis taxpayer.
19. Any conclusion of law deemed a finding of fact is so adopted.

Conclusions of Law

1. The court has jurisdiction of the parties and subject matter, 28 U.S.C. § 1346(a)(1).
2. Reserves or deposits established by a taxpayer against contingent or future liabilities are not currently deductible. Thus, a taxpayer who establishes a reserve in an effort to ensure against future losses is not entitled to a deduction at the time the reserve is established or funded. A deduction is proper when the liability becomes fixed.
*283 3. Steere’s payment of $222,092.07 in the premium contract account in fiscal year 1972 was not a fixed and definite expense at that time. Tri-State was not Steere’s insurer because Tri-State has no risk beyond Steere’s insolvency. Steere’s payment into the premium contract account has no demonstrable relationship to Steere’s claims experience or expectations. Tri-State has no competitive incentive to keep the premiums low. In fact, Tri-State’s only incentive was to extract payments as large as possible in order to protect itself against its only risk, Steere’s insolvency. In effect, Steere was in a position to unilaterally name any figure above a minimum required by TriState to protect against its limited risk. If such payments were fully deductible, Steere would be in a position to defer taxation of an indeterminate portion of its income for several years. It is true of course that Steere loses the benefit or control of these funds for a period until they are returned as provided in the agreement. The court is of the opinion that mere loss of control is not sufficient to establish deductibility especially when the “loss” is limited by an agreement to return a portion of the funds at a later time and when the loss of control is to a company related to Steere by common ownership and management.
4. The Tri-State/Steere/A & I agreement lacked the fundamental aspects of an insurance agreement since the agreement did not shift the risk of loss to Tri-State, and there was no genuine pooling of risk. As of the lease operators, they shifted their risk to Steere, not to Tri-State. Tri-State has no investment interest in the account.
5. The agreement failed to demonstrate the ordinary indicia of a legitimate insurance arrangement that justifies the deduction of such business expenses in the usual case. In truth, the plan more closely approximates a clever estate planning device.
6. The $222,092.07 paid into the premium contract account in fiscal year 1972 was not an expense made deductible by § 162(a); nor did the payment satisfy the “all events test” of 26 U.S.C.A. § 461(a). Steere was not entitled, therefore, to deduct this payment although it was entitled to deduct $114,422.46 paid out of the premium contract account during fiscal year 1972 for claims and related expense.
7. Any finding of fact deemed a conclusion of law is so adopted.
8. Judgment in accordance with findings shall be prepared by defendant, forwarded to plaintiff for its approval as to form, and returned to the court within fourteen (14) days of the entry of this order.
Dated this 15th day of June, 1976.
s/ Robert M. Hill United States District Judge