COMMISSIONER OF INTERNAL REVENUE *v.*
CLARK ET UX.

No. 87–1168.   Argued November 7, 1988—Decided March 22, 1989

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, MARSHALL, BLACKMUN, O'CONNOR, and KENNEDY, JJ., joined, and in all but Part III of which SCALIA, J., joined. WHITE, J., filed a dissenting opinion, *post*, p. 745.

*Alan I. Horowitz* argued the cause for petitioner. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Rose, Deputy Solicitor General Wallace,* and *Ernest J. Brown.*

*Walter B. Slocombe* argued the cause for respondents. With him on the brief was *Daniel B. Rosenbaum.*

JUSTICE STEVENS delivered the opinion of the Court.*

This is the third case in which the Government has asked us to decide that a shareholder's receipt of a cash payment in exchange for a portion of his stock was taxable as a dividend. In the two earlier cases, *Commissioner* v. *Estate of Bedford,* 325 U. S. 283 (1945), and *United States* v. *Davis,* 397 U. S. 301 (1970), we agreed with the Government largely because the transactions involved redemptions of stock by single corporations that did not "result in a meaningful reduction of the shareholder's proportionate interest in the corporation."

---

*JUSTICE SCALIA joins all but Part III of this opinion.

*Id.*, at 313. In the case we decide today, however, the taxpayer[1] in an arm's-length transaction exchanged his interest in the acquired corporation for less than 1% of the stock of the acquiring corporation and a substantial cash payment. The taxpayer held no interest in the acquiring corporation prior to the reorganization. Viewing the exchange as a whole, we conclude that the cash payment is not appropriately characterized as a dividend. We accordingly agree with the Tax Court and with the Court of Appeals that the taxpayer is entitled to capital gains treatment of the cash payment.

## I

In determining tax liability under the Internal Revenue Code of 1954, gain resulting from the sale or exchange of property is generally treated as capital gain, whereas the receipt of cash dividends is treated as ordinary income.[2] The Code, however, imposes no current tax on certain stock-for-stock exchanges. In particular, § 354(a)(1) provides, subject to various limitations, for nonrecognition of gain resulting from the exchange of stock or securities solely for other stock or securities, provided that the exchange is pursuant to a plan of corporate reorganization and that the stock or securi-

---

[1] Respondent Peggy S. Clark is a party to this action solely because she filed a joint federal income tax return for the year in question with her husband, Donald E. Clark. References to "taxpayer" are to Donald E. Clark.

[2] In 1979, the tax year in question, the distinction between long-term capital gain and ordinary income was of considerable importance. Most significantly, § 1202(a) of the Code, 26 U. S. C. § 1202(a) (1976 ed., Supp. III), allowed individual taxpayers to deduct 60% of their net capital gain from gross income. Although the importance of the distinction declined dramatically in 1986 with the repeal of § 1202(a), see Tax Reform Act of 1986, Pub. L. 99–514, § 301(a), 100 Stat. 2216, the distinction is still significant in a number of respects. For example, 26 U. S. C. § 1211(b) (1982 ed., Supp. IV) allows individual taxpayers to deduct capital losses to the full extent of their capital gains, but only allows them to offset up to $3,000 of ordinary income insofar as their capital losses exceed their capital gains.

ties are those of a party to the reorganization.[3]  26 U. S. C. § 354(a)(1).

Under § 356(a)(1) of the Code, if such a stock-for-stock exchange is accompanied by additional consideration in the form of a cash payment or other property—something that tax practitioners refer to as "boot"—"then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property."  26 U. S. C. § 356(a)(1).  That is, if the shareholder receives boot, he or she must recognize the gain on the exchange up to the value of the boot.  Boot is accordingly generally treated as a gain from the sale or exchange of property and is recognized in the current tax year.

Section 356(a)(2), which controls the decision in this case, creates an exception to that general rule.  It provided in 1979:

"If an exchange is described in paragraph (1) but has the effect of the distribution of a dividend, then there shall be treated as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after

---

[3] Title 26 U. S. C. § 368(a)(1) defines several basic types of corporate reorganizations.  They include, in part:

"(A) a statutory merger or consolidation;

.            .            .            .

"(D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356;

"(E) a recapitalization;

"(F) a mere change in identity, form, or place of organization of one corporation, however effected . . . ."

February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be treated as gain from the exchange of property." 26 U. S. C. § 356 (a)(2) (1976 ed.).

Thus, if the "exchange . . . has the effect of the distribution of a dividend," the boot must be treated as a dividend and is therefore appropriately taxed as ordinary income to the extent that gain is realized. In contrast, if the exchange does not have "the effect of the distribution of a dividend," the boot must be treated as a payment in exchange for property and, insofar as gain is realized, accorded capital gains treatment. The question in this case is thus whether the exchange between the taxpayer and the acquiring corporation had "the effect of the distribution of a dividend" within the meaning of § 356(a)(2).

The relevant facts are easily summarized. For approximately 15 years prior to April 1979, the taxpayer was the president of Basin Surveys, Inc. (Basin). In January 1978, he became sole shareholder in Basin, a company in which he had invested approximately $85,000. The corporation operated a successful business providing various technical services to the petroleum industry. In 1978, N. L. Industries, Inc. (NL), a publicly owned corporation engaged in the manufacture and supply of petroleum equipment and services, initiated negotiations with the taxpayer regarding the possible acquisition of Basin. On April 3, 1979, after months of negotiations, the taxpayer and NL entered into a contract.

The agreement provided for a "triangular merger," whereby Basin was merged into a wholly owned subsidiary of NL. In exchange for transferring all of the outstanding shares in Basin to NL's subsidiary, the taxpayer elected to receive 300,000 shares of NL common stock and cash boot of $3,250,000, passing up an alternative offer of 425,000 shares of NL common stock. The 300,000 shares of NL issued to the taxpayer amounted to approximately 0.92% of the out-

standing common shares of NL. If the taxpayer had instead accepted the pure stock-for-stock offer, he would have held approximately 1.3% of the outstanding common shares. The Commissioner and the taxpayer agree that the merger at issue qualifies as a reorganization under §§ 368(a)(1)(A) and (a)(2)(D).[4]

Respondents filed a joint federal income tax return for 1979. As required by § 356(a)(1), they reported the cash boot as taxable gain. In calculating the tax owed, respondents characterized the payment as long-term capital gain. The Commissioner on audit disagreed with this characterization. In his view, the payment had "the effect of the distribution of a dividend" and was thus taxable as ordinary income up to $2,319,611, the amount of Basin's accumulated earnings and profits at the time of the merger. The Commissioner assessed a deficiency of $972,504.74.

Respondents petitioned for review in the Tax Court, which, in a reviewed decision, held in their favor. 86 T. C. 138 (1986). The court started from the premise that the question whether the boot payment had "the effect of the distribution of a dividend" turns on the choice between "two judicially articulated tests." *Id.*, at 140. Under the test advocated by the Commissioner and given voice in *Shimberg* v. *United States*, 577 F. 2d 283 (CA5 1978), cert. denied, 439 U. S. 1115 (1979), the boot payment is treated as though it were made in a hypothetical redemption by the acquired corporation (Basin) immediately *prior* to the reorganization.

---

[4] Section 368(a)(2)(D) provided in 1979:

"The acquisition by one corporation, in exchange for stock of a corporation (referred to in this subparagraph as 'controlling corporation') which is in control of the acquiring corporation, of substantially all of the properties of another corporation which in the transaction is merged into the acquiring corporation shall not disqualify a transaction under paragraph (1)(A) if (i) such transaction would have qualified under paragraph (1)(A) if the merger had been into the controlling corporation, and (ii) no stock of the acquiring corporation is used in the transaction." 26 U. S. C. § 368(a)(2)(D) (1976 ed.).

Under this test, the cash payment received by the taxpayer indisputably would have been treated as a dividend.[5] The second test, urged by the taxpayer and finding support in *Wright* v. *United States*, 482 F. 2d 600 (CA8 1973), proposes an alternative hypothetical redemption. Rather than concentrating on the taxpayer's prereorganization interest in the acquired corporation, this test requires that one imagine a pure stock-for-stock exchange, followed immediately by a *post*reorganization redemption of a portion of the taxpayer's shares in the acquiring corporation (NL) in return for a payment in an amount equal to the boot. Under § 302 of the Code, which defines when a redemption of stock should be treated as a distribution of dividend, NL's redemption of 125,000 shares of its stock from the taxpayer in exchange for the $3,250,000 boot payment would have been treated as capital gain.[6]

---

[5] The parties do not agree as to whether dividend equivalence for the purposes of § 356(a)(2) should be determined with reference to § 302 of the Code, which concerns dividend treatment of redemptions of stock by a single corporation outside the context of a reorganization. Compare Brief for Petitioner 28–30 with Brief for Respondents 18–24. They are in essential agreement, however, about the characteristics of a dividend. Thus, the Commissioner correctly argues that the "basic attribute of a dividend, derived from Sections 301 and 316 of the Code, is a pro rata distribution to shareholders out of corporate earnings and profits. When a distribution is made that is not a formal dividend, 'the fundamental test of dividend equivalency' is whether the distribution is proportionate to the shareholders' stock interests (*United States* v. *Davis*, 397 U. S. 301, 306 (1970))." Brief for Petitioner 7. Citing the same authority, but with different emphasis, the taxpayer argues that "the hallmark of a non-dividend distribution is a 'meaningful reduction of the shareholder's proportionate interest in the corporation.' *United States* v. *Davis*, 397 U. S. 301, 313 (1970)." Brief for Respondents 5.

Under either test, a prereorganization distribution by Basin to the taxpayer would have qualified as a dividend. Because the taxpayer was Basin's sole shareholder, any distribution necessarily would have been pro rata and would not have resulted in a "meaningful reduction of the [taxpayer's] proportionate interest in [Basin]."

[6] Section 302 provides in relevant part:

The Tax Court rejected the prereorganization test favored by the Commissioner because it considered it improper "to view the cash payment as an isolated event totally separate from the reorganization." 86 T. C., at 151. Indeed, it sug-

"(a) General rule

"If a corporation redeems its stock (within the meaning of section 317 (b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

"(b) Redemptions treated as exchanges

. . . . .

"(2) Substantially disproportionate redemption of stock

"(A) In general

"Subsection (a) shall apply if the distribution is substantially disproportionate with respect to the shareholder.

"(B) Limitation

"This paragraph shall not apply unless immediately after the redemption the shareholder owns less than 50 percent of the total combined voting power of all classes of stock entitled to vote.

"(C) Definitions

"For purposes of this paragraph, the distribution is substantially disproportionate if—

"(i) the ratio which the voting stock of the corporation owned by the shareholder immediately after the redemption bears to all of the voting stock of the corporation at such time,

"is less than 80 percent of—

"(ii) the ratio which the voting stock of the corporation owned by the shareholder immediately before the redemption bears to all of the voting stock of the corporation at such time.

"For purposes of this paragraph, no distribution shall be treated as substantially disproportionate unless the shareholder's ownership of the common stock of the corporation (whether voting or nonvoting) after and before redemption also meets the 80 percent requirement of the preceding sentence. . . ."

As the Tax Court explained, receipt of the cash boot reduced the taxpayer's potential holdings in NL from 1.3% to 0.92%. 86 T. C. 138, 153 (1986). The taxpayer's holdings were thus approximately 71% of what they would have been absent the payment. *Ibid.* This fact, combined with the fact that the taxpayer held less than 50% of the voting stock of NL after the hypothetical redemption, would have qualified the "distribution" as "substantially disproportionate" under § 302(b)(2).

gested that this test requires that courts make the "determination of dividend equivalency fantasizing that the reorganization does not exist." *Id.*, at 150 (footnote omitted). The court then acknowledged that a similar criticism could be made of the taxpayer's contention that the cash payment should be viewed as a postreorganization redemption. It concluded, however, that since it was perfectly clear that the cash payment would not have taken place without the reorganization, it was better to treat the boot "as the equivalent of a redemption *in the course of implementing the reorganization*," than "as having occurred *prior to and separate from the reorganization*." *Id.*, at 152 (emphasis in original).[7]

---

[7] The Tax Court stressed that to adopt the prereorganization view "would in effect resurrect the now discredited 'automatic dividend rule' . . . , at least with respect to pro rata distributions made to an acquired corporation's shareholders pursuant to a plan of reorganization." 86 T. C., at 152. On appeal, the Court of Appeals agreed. 828 F. 2d 221, 226–227 (CA4 1987).

The "automatic dividend rule" developed as a result of some imprecise language in our decision in *Commissioner* v. *Estate of Bedford*, 325 U. S. 283 (1945). Although *Estate of Bedford* involved the recapitalization of a single corporation, the opinion employed broad language, asserting that "a distribution, pursuant to a reorganization, of earnings and profits 'has the effect of a distribution of a taxable dividend' within [§ 356(a)(2)]." *Id.*, at 292. The Commissioner read this language as establishing as a matter of law that all payments of boot are to be treated as dividends to the extent of undistributed earnings and profits. See Rev. Rul. 56–220, 1956–1 Cum. Bull. 191. Commentators, see, *e. g.*, Darrel, The Scope of *Commissioner* v. *Bedford Estate*, 24 Taxes 266 (1946); Shoulson, Boot Taxation: The Blunt Toe of the Automatic Rule, 20 Tax L. Rev. 573 (1965), and courts, see, *e. g., Hawkinson* v. *Commissioner*, 235 F. 2d 747 (CA2 1956), however, soon came to criticize this rule. The courts have long since retreated from the "automatic dividend rule," see, *e. g., Idaho Power Co.* v. *United States*, 161 F. Supp. 807 (Ct. Cl.), cert. denied, 358 U. S. 832 (1958), and the Commissioner has followed suit, see Rev. Rul. 74–515, 1974–2 Cum. Bull. 118. As our decision in this case makes plain, we agree that *Estate of Bedford* should not be read to require that all payments of boot be treated as dividends.

The Court of Appeals for the Fourth Circuit affirmed. 828 F. 2d 221 (1987). Like the Tax Court, it concluded that although "[s]ection 302 does not explicitly apply in the reorganization context," id., at 223, and although § 302 differs from § 356 in important respects, id., at 224, it nonetheless provides "the appropriate test for determining whether boot is ordinary income or a capital gain," id., at 223. Thus, as explicated in § 302(b)(2), if the taxpayer relinquished more than 20% of his corporate control and retained less than 50% of the voting shares after the distribution, the boot would be treated as capital gain. However, as the Court of Appeals recognized, "[b]ecause § 302 was designed to deal with a stock redemption by a single corporation, rather than a reorganization involving two companies, the section does not indicate which corporation [the taxpayer] lost interest in." Id., at 224. Thus, like the Tax Court, the Court of Appeals was left to consider whether the hypothetical redemption should be treated as a prereorganization distribution coming from the acquired corporation or as a postreorganization distribution coming from the acquiring corporation. It concluded:

> "Based on the language and legislative history of § 356, the change-in-ownership principle of § 302, and the need to review the reorganization as an integrated transaction, we conclude that the boot should be characterized as a post-reorganization stock redemption by N. L. that affected [the taxpayer's] interest in the new corporation. Because this redemption reduced [the taxpayer's] N. L. holdings by more than 20%, the boot should be taxed as a capital gain." Id., at 224–225.

This decision by the Court of Appeals for the Fourth Circuit is in conflict with the decision of the Fifth Circuit in Shimberg v. United States, 577 F. 2d 283 (1978), in two important respects. In Shimberg, the court concluded that it was inappropriate to apply stock redemption principles in reorganization cases "on a wholesale basis." Id., at 287; see also ibid., n. 13. In addition, the court adopted the pre-

reorganization test, holding that "§ 356(a)(2) requires a determination of whether the distribution would have been taxed as a dividend if made prior to the reorganization or if no reorganization had occurred." *Id.*, at 288.

To resolve this conflict on a question of importance to the administration of the federal tax laws, we granted certiorari. 485 U. S. 933 (1988).

## II

We agree with the Tax Court and the Court of Appeals for the Fourth Circuit that the question under § 356(a)(2) whether an "exchange . . . has the effect of the distribution of a dividend" should be answered by examining the effect of the exchange as a whole. We think the language and history of the statute, as well as a commonsense understanding of the economic substance of the transaction at issue, support this approach.

The language of § 356(a) strongly supports our understanding that the transaction should be treated as an integrated whole. Section 356(a)(2) asks whether *"an exchange* is described in paragraph (1)" that "has the effect of the distribution of a dividend." (Emphasis supplied.) The statute does not provide that boot shall be treated as a dividend if its payment has the effect of the distribution of a dividend. Rather, the inquiry turns on whether the "exchange" has that effect. Moreover, paragraph (1), in turn, looks to whether "the property received in *the exchange* consists not only of property permitted by section 354 or 355 to be received without the recognition of gain but also of other property or money." (Emphasis supplied.) Again, the statute plainly refers to one integrated transaction and, again, makes clear that we are to look to the character of the exchange as a whole and not simply its component parts. Finally, it is significant that § 356 expressly limits the extent to which boot may be taxed to the amount of gain realized in the reorganization. This limitation suggests that Congress intended that boot not be treated in isolation from

the overall reorganization. See Levin, Adess, & McGaffey, Boot Distributions in Corporate Reorganizations — Determination of Dividend Equivalency, 30 Tax Lawyer 287, 303 (1977).

Our reading of the statute as requiring that the transaction be treated as a unified whole is reinforced by the well-established "step-transaction" doctrine, a doctrine that the Government has applied in related contexts, see, e. g., Rev. Rul. 75–447, 1975–2 Cum. Bull. 113, and that we have expressly sanctioned, see *Minnesota Tea Co.* v. *Helvering,* 302 U. S. 609, 613 (1938); *Commissioner* v. *Court Holding Co.,* 324 U. S. 331, 334 (1945). Under this doctrine, interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction. By thus "linking together all interdependent steps with legal or business significance, rather than taking them in isolation," federal tax liability may be based "on a realistic view of the entire transaction." 1 B. Bittker, Federal Taxation of Income, Estates and Gifts ¶ 4.3.5, p. 4–52 (1981).

Viewing the exchange in this case as an integrated whole, we are unable to accept the Commissioner's prereorganization analogy. The analogy severs the payment of boot from the context of the reorganization. Indeed, only by straining to abstract the payment of boot from the context of the overall exchange, and thus imagining that Basin made a distribution to the taxpayer independently of NL's planned acquisition, can we reach the rather counterintuitive conclusion urged by the Commissioner—that the taxpayer suffered no meaningful reduction in his ownership interest as a result of the cash payment. We conclude that such a limited view of the transaction is plainly inconsistent with the statute's direction that we look to the effect of the entire exchange.

The prereorganization analogy is further flawed in that it adopts an overly expansive reading of § 356(a)(2). As the Court of Appeals recognized, adoption of the prereorganization approach would "result in ordinary income treatment in

most reorganizations because corporate boot is usually distributed pro rata to the shareholders of the target corporation." 828 F. 2d, at 227; see also Golub, "Boot" in Reorganizations—The Dividend Equivalency Test of Section 356(a)(2), 58 Taxes 904, 911 (1980); Note, 20 Boston College L. Rev. 601, 612 (1979). Such a reading of the statute would not simply constitute a return to the widely criticized "automatic dividend rule" (at least as to cases involving a pro rata payment to the shareholders of the acquired corporation), see n. 8, *supra*, but also would be contrary to our standard approach to construing such provisions. The requirement of § 356(a)(2) that boot be treated as dividend in some circumstances is an exception from the general rule authorizing capital gains treatment for boot. In construing provisions such as § 356, in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision. See *Phillips, Inc.* v. *Walling*, 324 U. S. 490, 493 (1945) ("To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people"). Given that Congress has enacted a general rule that treats boot as capital gain, we should not eviscerate that legislative judgment through an expansive reading of a somewhat ambiguous exception.

The postreorganization approach adopted by the Tax Court and the Court of Appeals is, in our view, preferable to the Commissioner's approach. Most significantly, this approach does a far better job of treating the payment of boot as a component of the overall exchange. Unlike the prereorganization view, this approach acknowledges that there would have been no cash payment absent the exchange and also that, by accepting the cash payment, the taxpayer experienced a meaningful reduction in his potential ownership interest.

Once the postreorganization approach is adopted, the result in this case is pellucidly clear. Section 302(a) of the

Code provides that if a redemption fits within any one of the four categories set out in § 302(b), the redemption "shall be treated as a distribution in part or full payment in exchange for the stock," and thus not regarded as a dividend. As the Tax Court and the Court of Appeals correctly determined, the hypothetical postreorganization redemption by NL of a portion of the taxpayer's shares satisfies at least one of the subsections of § 302(b).[8] In particular, the safe harbor provisions of subsection (b)(2) provide that redemptions in which the taxpayer relinquishes more than 20% of his or her share of the corporation's voting stock and retains less than 50% of the voting stock after the redemption shall not be treated as distributions of a dividend. See n. 6, *supra*. Here, we treat the transaction as though NL redeemed 125,000 shares of its common stock (*i. e.*, the number of shares of NL common stock forgone in favor of the boot) in return for a cash payment to the taxpayer of $3,250,000 (*i. e.*, the amount of the boot). As a result of this redemption, the taxpayer's interest in NL was reduced from 1.3% of the outstanding common stock to 0.9%. See 86 T. C., at 153. Thus, the taxpayer relinquished approximately 29% of his interest in NL and retained less than a 1% voting interest in the corporation after the transaction, easily satisfying the "substantially disproportionate" standards of § 302(b)(2). We accordingly conclude that the boot payment did not have the effect of a dividend and that the payment was properly treated as capital gain.

## III

The Commissioner objects to this "recasting [of] the merger transaction into a form different from that entered

---

[8] Because the mechanical requirements of subsection (b)(2) are met, we need not decide whether the hypothetical redemption might also qualify for capital gains treatment under the general "not essentially equivalent to a dividend" language of subsection (b)(1). Subsections (b)(3) and (b)(4), which deal with redemptions of all of the shareholder's stock and with partial liquidations, respectively, are not at issue in this case.

into by the parties," Brief for Petitioner 11, and argues that the Court of Appeals' formal adherence to the principles embodied in § 302 forced the court to stretch to "find a redemption to which to apply them, since the merger transaction entered into by the parties did not involve a redemption," *id.*, at 28. There are a number of sufficient responses to this argument. We think it first worth emphasizing that the Commissioner overstates the extent to which the redemption is imagined. As the Court of Appeals for the Fifth Circuit noted in *Shimberg*, "[t]he theory behind tax-free corporate reorganizations is that the transaction is merely 'a continuance of the proprietary interests in the continuing enterprise under modified corporate form.' *Lewis* v. *Commissioner of Internal Revenue*, 176 F. 2d 646, 648 (CA1 1949); Treas. Reg. § 1.368–1(b). See generally Cohen, *Conglomerate Mergers and Taxation*, 55 A. B. A. J. 40 (1969)." 577 F. 2d, at 288. As a result, the boot-for-stock transaction can be viewed as a partial repurchase of stock by the continuing corporate enterprise—*i. e.*, as a redemption. It is, of course, true that both the prereorganization and postreorganization analogies are somewhat artificial in that they imagine that the redemption occurred outside the confines of the actual reorganization. However, if forced to choose between the two analogies, the postreorganization view is the less artificial. Although both analogies "recast the merger transaction," the postreorganization view recognizes that a reorganization has taken place, while the prereorganization approach recasts the transaction to the exclusion of the overall exchange.

Moreover, we doubt that abandoning the prereorganization and postreorganization analogies and the principles of § 302 in favor of a less artificial understanding of the transaction would lead to a result different from that reached by the Court of Appeals. Although the statute is admittedly ambiguous and the legislative history sparse, we are persuaded—even without relying on § 302—that Congress did not intend to except reorganizations such as that at issue

here from the general rule allowing capital gains treatment for cash boot. 26 U. S. C. § 356(a)(1). The legislative history of § 356(a)(2), although perhaps generally "not illuminating," *Estate of Bedford*, 325 U. S., at 290, suggests that Congress was primarily concerned with preventing corporations from "siphon[ing] off" accumulated earnings and profits at a capital gains rate through the ruse of a reorganization. See Golub, 58 Taxes, at 905. This purpose is not served by denying capital gains treatment in a case such as this in which the taxpayer entered into an arm's-length transaction with a corporation in which he had no prior interest, exchanging his stock in the acquired corporation for less than a 1% interest in the acquiring corporation and a substantial cash boot.

Section 356(a)(2) finds its genesis in § 203(d)(2) of the Revenue Act of 1924. See 43 Stat. 257. Although modified slightly over the years, the provisions are in relevant substance identical. The accompanying House Report asserts that § 203(d)(2) was designed to "preven[t] evasion." H. R. Rep. No. 179, 68th Cong., 1st Sess., 15 (1924). Without further explication, both the House and Senate Reports simply rely on an example to explain, in the words of both Reports, "[t]he necessity for this provision." *Ibid.;* S. Rep. No. 398, 68th Cong., 1st Sess., 16 (1924). Significantly, the example describes a situation in which there was no change in the stockholders' relative ownership interests, but merely the creation of a wholly owned subsidiary as a mechanism for making a cash distribution to the shareholders:

> "Corporation A has capital stock of $100,000, and earnings and profits accumulated since March 1, 1913, of $50,000. If it distributes the $50,000 as a dividend to its stockholders, the amount distributed will be taxed at the full surtax rates.
>
> "On the other hand, Corporation A may organize Corporation B, to which it transfers all its assets, the consideration for the transfer being the issuance by B of all its stock and $50,000 in cash to the stockholders of Corpora-

tion A in exchange for their stock in Corporation A. Under the existing law, the $50,000 distributed with the stock of Corporation B would be taxed, not as a dividend, but as a capital gain, subject only to the 12½ per cent rate. The effect of such a distribution is obviously the same as if the corporation had declared out as a dividend its $50,000 earnings and profits. If dividends are to be subject to the full surtax rates, then such an amount so distributed should also be subject to the surtax rates and not to the 12½ per cent rate on capital gain." *Ibid.*; H. R. Rep. No. 179, at 15.

The "effect" of the transaction in this example is to transfer accumulated earnings and profits to the shareholders without altering their respective ownership interests in the continuing enterprise.

Of course, this example should not be understood as exhaustive of the proper applications of § 356(a)(2). It is nonetheless noteworthy that neither the example, nor any other legislative source, evinces a congressional intent to tax boot accompanying a transaction that involves a bona fide exchange between unrelated parties in the context of a reorganization as though the payment was in fact a dividend. To the contrary, the purpose of avoiding tax evasion suggests that Congress did not intend to impose an ordinary income tax in such cases. Moreover, the legislative history of § 302 supports this reading of § 356(a)(2) as well. In explaining the "essentially equivalent to a dividend" language of § 302 (b)(1)—language that is certainly similar to the "has the effect . . . of a dividend" language of § 356(a)(2)—the Senate Finance Committee made clear that the relevant inquiry is "whether or not the transaction by its nature may properly be characterized as a sale of stock . . . ." S. Rep. No. 1622, 83d Cong., 2d Sess., 234 (1954); cf. *United States* v. *Davis*, 397 U. S., at 311.

Examining the instant transaction in light of the purpose of § 356(a)(2), the boot-for-stock exchange in this case "may

properly be characterized as a sale of stock." Significantly, unlike traditional single corporation redemptions and unlike reorganizations involving commonly owned corporations, there is little risk that the reorganization at issue was used as a ruse to distribute a dividend. Rather, the transaction appears in all respects relevant to the narrow issue before us to have been comparable to an arm's-length sale by the taxpayer to NL. This conclusion, moreover, is supported by the findings of the Tax Court. The court found that "[t]here is not the slightest evidence that the cash payment was a concealed distribution from BASIN." 86 T. C., at 155. As the Tax Court further noted, Basin lacked the funds to make such a distribution:

> "Indeed, it is hard to conceive that such a possibility could even have been considered, for a distribution of that amount was not only far in excess of the accumulated earnings and profits ($2,319,611), but also of the total assets of BASIN ($2,758,069). In fact, only if one takes into account unrealized appreciation in the value of BASIN's assets, including good will and/or going-concern value, can one possibly arrive at $3,250,000. Such a distribution could only be considered as the equivalent of a complete liquidation of BASIN . . . ." *Ibid.*[9]

In this context, even without relying on § 302 and the post-reorganization analogy, we conclude that the boot is better characterized as a part of the proceeds of a sale of stock than

---

[9] The Commissioner maintains that Basin "could have distributed a dividend in the form of its own obligation (see, *e. g.*, I. R. C. § 312(a)(2)) or it could have borrowed funds to distribute a dividend." Reply Brief for Petitioner 7. Basin's financial status, however, is nonetheless strong support for the Tax Court's conclusion that the cash payment was not a concealed dividend.

as a proxy for a dividend. As such, the payment qualifies for capital gains treatment.

The judgment of the Court of Appeals is accordingly

*Affirmed.*

JUSTICE WHITE, dissenting.

The question in this case is whether the cash payment of $3,250,000 by N. L. Industries, Inc. (NL) to Donald Clark, which he received in the April 18, 1979, merger of Basin Surveys, Inc. (Basin), into N. L. Acquisition Corporation (NLAC), had the effect of a distribution of a dividend under the Internal Revenue Code of 1954, 26 U. S. C. § 356(a)(2) (1976 ed.), to the extent of Basin's accumulated undistributed earnings and profits. Petitioner, the Commissioner of Internal Revenue (Commissioner), made this determination, taxing the sum as ordinary income, to find a 1979 tax deficiency of $972,504.74. The Court of Appeals disagreed, stating that because the cash payment resembles a hypothetical stock redemption from NL to Clark, the amount is taxable as capital gain. 828 F. 2d 221 (CA4 1987). Because the majority today agrees with that characterization, in spite of Clark's explicit refusal of the stock-for-stock exchange imagined by the Court of Appeals and the majority, and because the record demonstrates, instead, that the transaction before us involved a boot distribution that had "the effect of the distribution of a dividend" under § 356(a)(2)—and hence properly alerted the Commissioner to Clark's tax deficiency—I dissent.

The facts are stipulated. Basin, Clark, NL, and NLAC executed an Agreement and Plan of Merger dated April 3, 1979, which provided that on April 18, 1979, Basin would merge with NLAC. The statutory merger, which occurred pursuant to §§ 368(a)(1)(A) and (a)(2)(D) of the Code, and therefore qualified for tax-free reorganization status under § 354(a)(1), involved the following terms: Each outstanding share of NLAC stock remained outstanding; each out-

standing share of Basin common stock was exchanged for $56,034.482 cash and 5,172.4137 shares of NL common stock; and each share of Basin common stock held by Basin was canceled. NLAC's name was amended to Basin Surveys, Inc. The Secretary of State of West Virginia certified that the merger complied with West Virginia law. Clark, the owner of all 58 outstanding shares of Basin, received $3,250,000 in cash and 300,000 shares of NL stock. He expressly refused NL's alternative of 425,000 shares of NL common stock without cash. See App. 56–59.

Congress enacted § 354(a)(1) to grant favorable tax treatment to specific corporate transactions (reorganizations) that involve the exchange of stock or securities solely for other stock or securities. See *Paulsen* v. *Commissioner*, 469 U. S. 131, 136 (1985) (citing Treas. Reg. § 1.368–1(b), 26 CFR § 1.368–1(b) (1984), and noting the distinctive feature of such reorganizations, namely, continuity of interests). Clark's "triangular merger" of Basin into NL's subsidiary NLAC qualified as one such tax-free reorganization, pursuant to § 368(a)(2)(D). Because the stock-for-stock exchange was supplemented with a cash payment, however, § 356(a)(1) requires that "the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property." Because this provision permitted taxpayers to withdraw profits during corporate reorganizations without declaring a dividend, Congress enacted § 356(a)(2), which states that when an exchange has "the effect of the distribution of a dividend," boot must be treated as a dividend, and taxed as ordinary income, to the extent of the distributee's "ratable share of the undistributed earnings and profits of the corporation. . . ." *Ibid.;* see also H. R. Rep. No. 179, 68th Cong., 1st Sess., 15 (1924) (illustration of § 356(a)(2)'s purpose to frustrate evasion of dividend taxation through corporate reorganization distributions); S. Rep. No. 398, 68th Cong., 1st Sess., 16 (1924) (same).

Thus the question today is whether the cash payment to Clark had the *effect* of a distribution of a dividend. We supplied the straightforward answer in *United States* v. *Davis*, 397 U. S. 301, 306, 312 (1970), when we explained that a pro rata redemption of stock by a corporation is "essentially equivalent" to a dividend. A pro rata distribution of stock, with no alteration of basic shareholder relationships, is the hallmark of a dividend. This was precisely Clark's gain. As sole shareholder of Basin, Clark necessarily received a pro rata distribution of moneys that exceeded Basin's undistributed earnings and profits of $2,319,611. Because the merger and cash obligation occurred simultaneously on April 18, 1979, and because the statutory merger approved here assumes that Clark's proprietary interests continue in the restructured NLAC, the exact source of the pro rata boot payment is immaterial, which truth Congress acknowledged by requiring only that an exchange have the *effect* of a dividend distribution.

To avoid this conclusion, the Court of Appeals—approved by the majority today—recast the transaction as though the relevant distribution involved a single corporation's (NL's) stock redemption, which dividend equivalency is determined according to § 302 of the Code. Section 302 shields distributions from dividend taxation if the cash redemption is accompanied by sufficient loss of a shareholder's percentage interest in the corporation. The Court of Appeals hypothesized that Clark completed a pure stock-for-stock reorganization, receiving 425,000 NL shares, and thereafter redeemed 125,000 of these shares for his cash earnings of $3,250,000. The sum escapes dividend taxation because Clark's interest in NL theoretically declined from 1.3% to 0.92%, adequate to trigger § 302(b)(2) protection. Transporting § 302 from its purpose to frustrate shareholder sales of equity back to their own corporation, to § 356(a)(2)'s reorganization context, however, is problematic. Neither the majority nor the Court of Appeals explains why § 302 should obscure the core attribute

of a dividend as a pro rata distribution to a corporation's shareholders;[1] nor offers insight into the mechanics of valuing hypothetical stock transfers and equity reductions; nor answers the Commissioner's observations that the sole shareholder of an acquired corporation will always have a smaller interest in the continuing enterprise when cash payments combine with a stock exchange. Last, the majority and the Court of Appeals' recharacterization of market happenings describes the exact stock-for-stock exchange, without a cash supplement, that Clark refused when he agreed to the merger.

Because the parties chose to structure the exchange as a tax-free reorganization under § 354(a)(1), and because the pro rata distribution to Clark of $3,250,000 during this reorganization had the *effect* of a dividend under § 356(a)(2), I dissent.[2]

---

[1] The Court of Appeals' zeal to excoriate the "automatic dividend rule" leads to an opposite rigidity—an automatic nondividend rule, even for pro rata boot payments. Any significant cash payment in a stock-for-stock exchange distributed to a sole shareholder of an acquired corporation will automatically receive capital gains treatment. Section 356(a)(2)'s exception for such payments that have attributes of a dividend disappears. Congress did not intend to handicap the Commissioner and courts with either absolute; instead, § 356(a)(1) instructs courts to make fact-specific inquiries into whether boot distributions accompanying corporate reorganizations occur on a pro rata basis to shareholders of the acquired corporation, and thus threaten a bailout of the transferor corporation's earnings and profits escaping a proper dividend tax treatment.

[2] The majority's alternative holding that no statutory merger occurred at all—rather a taxable sale—is difficult to understand: All parties stipulate to the merger, which, in turn, was approved under West Virginia law; and Congress endorsed exactly such tax-free corporate transactions pursuant to its § 368(a)(1) reorganization regime. However apt the speculated sale analogy may be, if the April 3 Merger Agreement amounts to a sale of Clark's stock to NL, and not the intended merger, Clark would be subject to taxation on his full gain of over $10 million. The fracas over tax treatment of the cash boot would be irrelevant.