Chief Judge KOZINSKI,
dissenting:
The majority makes mincemeat of the one-year filing requirement. Illegal immigrants can now sit on their asylum claims indefinitely, assured that virtually any change in country conditions will excuse their lateness. This is contrary to the text and purpose of the statute, and runs roughshod over our precedent.
While a worsening of country conditions can sometimes constitute a “changed circumstance,” see Fakhry v. Mukasey, 524 F.3d 1057 (9th Cir.2008); see also 8 C.F.R. § 208.4(a)(4)(i)(A), this worsening must “materially affect the applicant’s eligibility for asylum,” 8 U.S.C. § 1158(a)(2)(D). What must be materially altered isn’t the country conditions, but the alien’s eligibility. Going from “eligible” to “still eligible” is no change at all, much less a material one. Under the plain language of the statute, a petitioner must show that, prior to the changed circumstances, he was ineligible for asylum.
Congress enacted IIRIRA “to expedite the physical removal of those aliens not entitled to admission to the United States.” Coyt v. Holder, 593 F.3d 902, 906 (9th Cir.2010); see also Morales-Izquierdo v. Gonzales, 486 F.3d 484, 494 (9th Cir.2007) (en banc) (“Congress’ ambitious purpose behind IIRIRA was to enable the prompt admission of those who are entitled to be admitted, [and] the prompt exclusion or removal of those who are not ____” (internal quotation mark omitted)). Congress adopted the one-year limitation period as part of IIRIRA’s statutory scheme because it found that “[t]he asylum system has been abused by those who seek to use it as a means of ‘backdoor’ immigration.” H.R.Rep. No. 104-469, pt. 1, at 107 (1996). As the Second Circuit observed, “Congress intended the one-year deadline to prevent persons who had resided in the United States for an extended period of time from applying for asylum as an afterthought, after overstaying their visas or failing to obtain citizenship through another means.” Joaquin-Porras v. Gonzales, 435 F.3d 172, 180 (2d Cir.2006) (citing H.R.Rep. No. 104-469, pt. 1, at 116). Finding a “changed circumstance” exception whenever a new development is “nontrivial,” maj. op. at 1044 n. 4, “undermine[s] the one-year deadline’s clear purpose of focusing the asylum process on those who have recently fled persecution in their home countries,” Joaquin-Porras, 435 F.3d at 180.
The majority argues that Congress intended the exceptions to the one-year deadline to be broad by virtue of the fact that it expressly rejected an expansive “good cause” exception in favor of the significantly more limited “changed circumstances” exception. Maj. op. at 1045. But see Luciana v. Att’y Gen. of the U.S., 502 F.3d 273, 277 (3d Cir.2007) (describing the exceptions as “narrow”). Such reasoning not only defies logic, but ignores the Supreme Court’s instruction that when “construing provisions ... in which a general statement of policy is qualified by an exception, [we] read the exception narrow *1049 ly in order to preserve the primary operation of the provision.” Knight v. Comm’r, 552 U.S. 181, 190, 128 S.Ct. 782, 169 L.Ed.2d 652 (2008) (omission in original) (quoting Comm’r v. Clark, 489 U.S. 726, 739, 109 S.Ct. 1455, 103 L.Ed.2d 753 (1989)) (internal quotation mark omitted). Reading the “changed circumstances” exception narrowly is necessary not just to preserve the primary operation of the one-year filing deadline, but to keep the exception from swallowing it whole.
Requiring a petitioner to show that he was previously ineligible for asylum dovetails with our interpretation of the statute’s parallel exception for “extraordinary circumstances.” 8 U.S.C. § 1158(a)(2)(D); cf. Husyev v. Mukasey, 528 F.3d 1172, 1180 (9th Cir.2008) (looking to case law interpreting the “parallel issue” of “changed circumstances” to interpret the “extraordinary circumstances” provision). We recently interpreted this exception to require a petitioner to show that extraordinary circumstances “prevented him from timely filing an asylum application.” Toj-Culpatan v. Holder, 612 F.3d 1088, 1091 (9th Cir.2010) (per curiam). It is similarly reasonable to infer that Congress meant the “changed circumstances” exception to apply only where, prior to the change, petitioner could not file for asylum because he was ineligible. Although the exceptions are different — extraordinary circumstances must “directly relate[ ] to the failure to meet the 1-year deadline,” while changed circumstances must “materially affect the applicant’s eligibility for asylum,” 8 C.F.R. § 208.4(a)(4) — (5)—both are limited exceptions for situations where an applicant couldn’t file earlier, because he was prevented by extraordinary circumstance or prevented by his inability to meet all the requirements for asylum.
Fakhry v. Mukasey, 524 F.3d 1057 (9th Cir.2008), adopts precisely this approach to “changed circumstances.” Fakhry holds that, because asylum requires “both subjectively genuine and objectively reasonable” fear of persecution, a petitioner may be able to show changed circumstances based on a worsening of country conditions (the objective prong), even when he always feared persecution (the subjective prong). Fakhry, 524 F.3d at 1063 (quoting Al-Harbi v. INS, 242 F.3d 882, 888 (9th Cir.2001)) (internal quotation marks omitted). We allowed Fakhry’s claim to go forward because “a likely purpose of the exception [is] to excuse late applications when an alien previously had a weak or nonexistent case for asylum.” Id. (emphasis added). “Why,” we asked, “should [an applicant] be penalized for declining to clog the immigration courts with a meritless application?” Id. at 1064 (emphasis added). The majority creates a square conflict with Fakhry: Where, as here, the asylum-seeker has a meritorious asylum claim from day one, the exception must give way to the overriding purpose of the deadline discussed above.
Vahora can’t argue he couldn’t file within a year of his arrival in the United States because he didn’t have a meritorious asylum claim; his claim was quite strong from day one. He credibly testified that after a meeting was held at his home to discuss the destruction of the local mosque by Hindu youths, “the[ police] took [him] to Mahla police station and they put [him] in a room. They started beating [him] as well as calling [him] names using bad language. And they were alleging that [he] was a Muslim and creating disturbance in the area of Hindus.” Vahora also testified about another time he was arrested, when the police detained him for fifteen days and “beat [him] once or twice every day, every time, and [he] was beaten from 25 to 30 times .... saying that [he] was a traitor against the national interest and wanted some kind of disturbance in their Hindu areas.” He testified that “[t]he police *1050 would beat [him] with the leather belts and batons. They would beat [him] with the hands as well as the boots. The police would hold [him] by [his] hair and strike [his] head against the wall.” This evidence of past religious persecution, if believed, would be more than enough to meet the requirements for asylum. See, e.g., Zhao v. Mukasey, 540 F.3d 1027, 1028, 1031 (9th Cir.2008) (petitioners credibly testified police officer beat them for religious practices); see also, e.g., Kamalyan v. Holder, 620 F.3d 1054, 1055-57 (9th Cir.2010) (petitioner credibly testified police detained and beat him for being a Jehovah’s Witness); Li v. Holder, 559 F.3d 1096, 1107-08 (9th Cir.2009) (petitioner credibly testified police beat him once and detained him at a labor camp for fifteen days, where he was beaten by fellow detainees). The majority doesn’t disagree.
Given the clear evidence of religious persecution that Vahora suffered before he left India, any deterioration of country conditions couldn’t have affected his already strong claim for asylum. In Vahora’s case, we need not even speculate: We know he would have been granted asylum because the IJ relied exclusively on events before Vahora fled India to grant him relief under the more stringent standard for withholding of removal. See Singh v. INS, 134 F.3d 962, 971 (9th Cir.1998). Without an effect on his eligibility, there can be no changed circumstances, regardless of how much country conditions may have deteriorated.
But what if Vahora had applied for asylum as soon as he arrived and was denied relief? If country conditions subsequently worsened, he would in no way be punished for his diligence in filing his initial claim. See Malty v. Ashcroft, 381 F.3d 942, 945 (9th Cir.2004). The regulations expressly contemplate that an asylum seeker’s case might improve after his first application is rejected: 8 C.F.R. § 1003.2(c)(3)(ii) allows aliens to “reapply for asylum or withholding of deportation based on changed circumstances arising in the country of nationality.” Such applicants are exempted from the time limits that normally apply to motions to reopen, meaning that they’re free to reapply for asylum whenever they believe they have a stronger claim. See id. § 1003.2(c)(3). The regulatory scheme anticipates that some asylum applicants may have borderline cases at the start, and expresses a preference that they timely announce their presence in the United States by filing an asylum application within a year of entry — with the possibility of reopening their case if it later becomes stronger — rather than hiding in the weeds until they feel like applying.
Country conditions change constantly, often going from bad to worse. Letting asylum applicants decide when things are bad enough to warrant an asylum application undermines Congress’s effort to make asylum applicants present their claims promptly. Allowing a petitioner who has a strong claim to wait until his claim gets even stronger renders the one-year limit imposed by Congress meaningless. The only way to give effect to the statutory scheme is to require a petitioner who has a plausible claim for asylum to present it within one year of entering the United States or within a reasonable time after he develops such a claim, if this happens after the one-year period has elapsed.
The majority’s mischief reveals the larger problem with reviewing the BIA’s determination at all. See Ramadan v. Keisler, 504 F.3d 973 (9th Cir.2007) (O’Scannlain, J., dissenting from denial of rehearing en banc). Every other circuit to have addressed the issue — ten in all— has found that we lack jurisdiction to review the “changed circumstances” exception because it is a “discretionary [decision] committed to the Executive Branch.” *1051 Jarbough v. Att’y Gen. of the United States, 483 F.3d 184, 190 (3d Cir.2007). In the immigration context, the need for national uniformity is paramount so that the BIA can bring its expertise to bear on these difficult and fact-intensive issues, see Kaganovich v. Gonzales, 470 F.3d 894, 897-98 (9th Cir.2006), and to avoid forum-shopping “by those who seek to use [asylum] as a means of ‘backdoor’ immigration,” H.R.Rep. No. 104-469, pt. 1, at 107. Yet, in three short years, we have gutted the statutory mandate so that changed circumstances need be demonstrated not “to the satisfaction of the Attorney General,” 8 U.S.C. § 1158(a)(2)(D), but to the satisfaction of two judges on an appellate panel. This usurpation of executive power directly contravenes the Real ID Act, and the majority’s sweeping expansion of the changed circumstances exception reveals just why we should never have started down this path to begin with. We were wrong in failing to take Ramadan en banc. Fortunately, we will now have an opportunity to correct that error.
With one swift blow, the majority pretty much knocks out the one-year filing deadline for asylum claims, showing once again that no statute, no matter how clear, is safe from usurpation by judges willing to engage in creative interpretation. It’s a tired game, and I’ll have no part in it.