**Betty R. BROWN; Michael J. Brown; Philip A. Melrose; Beryl Rae, as Co–Trustee of the Marital Trust Created under the will of Willet H. Brown; Raymond C. Sandler, as Co–Trustees of the Marital Trust Created Under the Will of Willet H. Brown, Plaintiffs–Appellants,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 02–55254.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 4, 2003.

Filed May 1, 2003.

Charles L. Birke, Sandler and Rosen, LLP, Los Angeles, CA, for the plaintiffs-appellants.

Judith A. Hagley, Tax Division, Department of Justice, Washington, DC, for the defendant-appellee.

Before MESKILL,* FERGUSON, and BERZON, Circuit Judges.

## OPINION

BERZON, Circuit Judge:

The estate tax combines into one sad transaction the only two certainties in life. Upon death, a decedent's estate must pay a tax on property owned immediately prior to death, subject to certain adjustments. 26 U.S.C. § 2001 et seq.[1]

This appeal involves three of those adjustments. First, we must determine whether the Internal Revenue Service ("IRS") properly increased the estate tax owed by the estate of Willet Brown ("the Estate") under § 2035(c)(1993), a provision which increases the estate tax to account for gift taxes paid in the three years immediately prior to death. To answer that question, we must consider whether the IRS was entitled to apply the "step transaction" doctrine, treating gift taxes paid by Betty Brown as if paid by Willet Brown. The district court determined that the IRS

---

* The Honorable Thomas J. Meskill, United States Circuit Judge, United States Court of Appeals for the Second Circuit, sitting by designation.

1. All further citations are to 26 U.S.C. unless otherwise indicated. This appeal is governed by the statutes and regulations in place in 1993 when Willet died. For convenience, we cite to the current authority unless the distinction is relevant, in which case we cite the superseded authority and so note.

properly ascribed the payment of the gift taxes to Willet Brown, as do we.

The second, more complex issue involves the interaction of two estate tax deductions: the marital deduction (§ 2056) and the administration expense deduction (§ 2053(a)(2)). The Estate argues that it is entitled to increase the administration expense deduction to account for higher-than-expected administration expenses. The IRS agrees, but argues that any increase in that deduction must by offset by a corresponding decrease in the marital deduction to the extent that expenses were paid out of funds otherwise earmarked for the marital trust. The district court ruled in favor of the IRS. We affirm on that issue as well.

## BACKGROUND

Willet Brown ("Willet") died in 1993, leaving behind a sizeable estate, worth approximately $180,000,000. Pursuant to a pre-nuptial agreement between Willett and wife Betty Brown ("Betty"), the entire estate was Willet's separate property, California community property laws notwithstanding.

### (A) The Estate Tax Plan

Prior to his death, Willet sought the advice of an estate tax attorney. Together, the two developed a plan pursuant to which Willet's entire net estate would be placed in a marital trust upon his death. During her life, Betty would be the income beneficiary of this marital trust. Through the operation of the marital deduction rules of § 2056 this arrangement allowed Willet both to provide financial stability to Betty and to defer the collection of estate taxes until after Betty's death. *See Brown v. United States,* 2001 WL 1480293, 88 A.F.T.R.2d.2001–6665, *1 (C.D.Cal.2001).

As part of this plan Willet also created an insurance trust to hold life insurance on Betty's life, presumably so that the heirs receiving the estate property upon her death could use the life insurance proceeds to pay estate taxes. To fund the life insurance trust Willet gave Betty a gift of $3,100,000. Betty promptly wrote a check from her separate checking account for that amount in favor of the life insurance trust.

Whether the $3,100,000 was paid by Betty or Willet is immaterial to the current appeal. The parties agree that the $3,100,000 payment into the life insurance trust was a taxable event, incurring gift tax liability of $1,415,732. They further agree that Willet and Betty properly elected to be jointly and severally liable for the gift taxes under § 2513(a) & (d).

At issue is whether Willet or Betty paid the gift taxes. If the spouse who paid the gift taxes died within three years of doing so, § 2035(c)(1993) would require that spouse's estate to pay estate taxes on the $1,415,732 in gift taxes.[2] As Willet died within three years of the payment, it is preferable to the Estate that Betty be considered the individual who paid the gift tax.

We here pause to explain why the IRS would require a decedent to pay estate taxes on gift taxes, a concept that, on its face, gives new meaning to the phrase "double taxation." Section 2035(c)(1993) is designed to recoup any advantage gained

---

**2.** When Willet died in 1993, § 2035(c) stated:
The amount of the gross estate (determined without regard to this subsection) shall be increased by the amount of any tax paid under chapter 12 by the decedent or his estate on any gift made by the decedent or

his spouse after December 31, 1976, and during the 3 year period ending on the date of the decedent's death.
In 1997, this section was re-codified, with minor changes not relevant here, as § 2035(b).

by so-called "death-bed" transfers in which a taxpayer, cognizant of impending mortality, transfers property out of her estate in order to reduce estate tax liability. *See Block v. United States,* 507 F.2d 603, 605 (5th Cir.1975) (discussing predecessor of the current § 2035). Although these *inter vivos* transfers incur gift tax liability, opting to transfer assets prior to death still carries a tax advantage.[3] Gift tax is calculated using a tax exclusive method (the applicable rate is applied to the *net* gift, exclusive of gift taxes), whereas estate taxes are calculated on a tax inclusive method (the applicable rate is applied to the *gross* estate, before taxes are deducted).[4] Section 2035(c)(1993) presumes that gifts made within three years of death are made with tax-avoidance motives and eliminates the tax advantage for those death bed transactions.

Back to our story: Willet and his attorney realized at the time of the life insurance trust transaction, that in light of § 2035(c)(1993), it was a better actuarial bet for Betty, rather than Willet, to pay the gift taxes. True, if Betty paid the gift taxes and then died within three years of doing so, her estate might owe estate taxes on the gift taxes through the operation of § 2035(c)(1993). But Betty, age 71, was more likely to outlive the 3–year reach of § 2035(c)(1993) than was Willet, age 87. A good plan, but the couple faced a practical problem: Betty had little money of her own and was therefore unable to make the necessary payments from her separate property.

So Willet, on the advice of his estate tax attorney, gave Betty two checks totaling $1,415,732, which she deposited in her own account. The next day she drew two checks from her personal account payable to the IRS for the identical amount, in satisfaction of the gift tax liability. (Be-

---

**3.** The discussion in the text pertains to the federal estate tax provisions prior to the 2001 Economic Growth and Tax Relief Reconciliation Act ("2001 Act"), Pub.L. No. 107–16, §§ 501–581. That act phases out the estate tax for future decedents, but with "sunset" provisions. For a discussion of these changes, none of which affect the Estate, see Charles F. Newlin & Andrea C. Chomakos, *The 2001 Tax Act: Unchartered Waters for Estate Planners,* 15–OCT Prob. & Prop. 32 (2001).

**4.** A stylized example of this effect might proceed as follows: Suppose a taxpayer had a taxable estate of $1,400,000. If the taxpayer waits to transfer the money through a post-mortem transfer, the estate tax would be calculated by applying the applicable tax rate (assume 40% for ease of calculation) to the gross amount of the estate ($1,400,000), resulting in an estate tax liability of $560,000 and a net gift to the heirs of $840,000. In contrast, had the taxpayer made an *inter vivos* gift of $1,000,000, the gift tax would be calculated by applying the applicable tax rate to the $1,000,000 gift, resulting in a gift tax liability of $400,000 (40% × $1,000,000) (In

most instances gift and estate taxes are imposed at the same rate. §§ 2001(b-c); 2501(a)(1); 2502). Paying gift rather than estate taxes thus puts $160,000 more of the $1,400,000 in total funds in the pockets of the estate beneficiaries. *See* Jeffrey G. Sherman, *Hairsplitting Under I.R.C. Under Section 2035(d): The Cause and The Cure,* 16 Va. Tax Review 111, 121 & n. 49 (1996) (providing similar calculations); Jeffery N. Pennell & Alan Newman, *Wealth Transfer Tax Basics,* SD85 ALIABA 1, 40 (1999) (same).

The tax code does not care for such manipulable results. If an *inter vivos* gift is made within three years of the decedent's death, Section 2035(c)(1993) requires that the taxable estate include the $400,000 in previously untaxed gift taxes. This mandate creates an estate tax liability of $160,000 (40% × $400,000), thereby eliminating the advantage of *inter vivos* gifts. (This example does not take account of the provisions, *discussed infra,* allowing small annual gifts (§ 2503(b)) or "split-gift" treatment between spouses (§ 2513), nor does it consider a variety of other factors which could alter the details of any particular example.)

cause gifts between spouses are tax free, the gifts from Willet to Betty enabling this actuarial wager did not otherwise risk any gift or estate tax liability.) As the Brown estate admits, this money was given to Betty on the "understanding" that Betty would use it to satisfy the gift tax liability.[5] Betty was, however, under no legally enforceable obligation to use the funds in that fashion.

### (B) The Estate Tax Return & Litigation

Willet won the actuarial bet he might have preferred to lose. He died in 1993, within three years of the gift tax payment.

In 1995, the Estate prepared an estate tax return indicating zero tax liability. The zero balance reflected: (1) the absence of any tax payment on the above-described gift tax, based on the assumption that Betty made the payment; and (2) a marital trust comprising the remaining estate (after expected administration expenses), which passed to Betty and was therefore eligible for the marital deduction.

The IRS—predictably—disagreed with the Estate's tax return. The IRS claimed that, in substance if not in form, Willet paid the gift taxes so the $1,415,732 should be included in the Estate. In addition, as those funds did not pass to the marital trust but rather were used to benefit the beneficiaries of the life insurance trust, those funds, maintained the IRS, were not eligible for the marital deduction. The IRS consequently assessed a tax deficiency on the $1,415,732 and interest thereon.

The Estate—predictably—did not accept the IRS analysis. The executor remitted the requested sums but filed for a claim of abatement. After the IRS took no action

on the abatement request, the executor filed for a rebate in 1999, raising several claims.

The Estate claims, first, that the gift taxes paid by Betty should not be included in the Estate. On cross-motions for summary judgment the district court denied that contention. Applying the "step transaction" doctrine, the district court determined that the transactions leading up to Betty's satisfaction of the gift tax liability should be treated, for tax purposes, as one integrated transaction. Using that approach, Willet becomes the taxpayer, as the gift tax payment traces back to Willet's gift to Betty of the precise amount of the tax. We agree with the district court that the gift tax payment is properly attributed to Willet.

The Estate also advances an alternative approach which, it argues, entitles it to a refund. The Estate notes that it actually incurred $3,592,024 in administration expenses, deductible from the gross estate under § 2053(a)(2). Because those expenses exceeded (by $1,712,024) the deduction the estate originally claimed for administration expenses ($1,880,000), the Estate argues that it was entitled to increase the administration expense deduction by $1,712,024. In a similar vein, the Estate argues that it is entitled to a deduction, under § 2053(a)(2), for the interest paid on unpaid estate taxes.

The IRS agrees that the Estate may deduct the additional administration expense and interest. It maintains, however, that some of the increased deductions require a corresponding decrease in the marital deduction. In essence, the IRS argues that some of the increased expenses were paid out of funds otherwise earmarked for the marital trust, so that any increase in

---

**5.** The Estate emphasizes that "understanding" connotes a "mutual contemplation" rather than an "obligation." As we will dis-

cuss, this distinction does not change our analysis.

those expenses decreased those funds and therefore the marital deduction.

On this point the district court held, after a bench trial, that the Estate was entitled to increase the administration expense deduction. With respect to expenses related to interest paid on unpaid estate taxes, the court held, the Estate need not adjust the marital deduction. With respect to non-interest expenses, the result was more complicated: Relying on *Commissioner v. Estate of Hubert*, 520 U.S. 93, 100, 117 S.Ct. 1124, 137 L.Ed.2d 235 (1997), which interpreted regulations, now superseded, in place at the time that Willet died, the district court determined that the answer depended on whether the funds were paid out of the income created by the marital trust or out of the trust corpus itself. To the extent that the administration expenses were paid out of income, the district court ruled, the Estate need not reduce the marital deduction. The district court determined, however, that any expenses paid from the corpus of the marital trust reduced the amount of the marital deduction.

In this appeal, the Estate challenges this final conclusion, that any administration expenses paid from the trust corpus decreased the marital deduction. The IRS does not cross-appeal the district court's finding in favor of the Estate on the interest issue, or the issue of expenses paid out of income earned by the marital trust.

### STANDARDS OF REVIEW

With respect to the step transaction issue, the district court granted summary judgment in favor of the government. We ordinarily review grants of summary judgement *de novo*, to determine whether there are genuine issues of material fact

and whether the district court correctly applied the substantive law. *Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir.2002).

■ The Estate does not contend, however, that there is any genuine issue of material fact requiring trial. Rather, the Estate contends that the application of the step transaction to undisputed facts is a matter of law requiring our *de novo* review.

The IRS, in contrast, argues that the application of the step transaction doctrine to undisputed facts is itself a question of fact. It further contends that because the underlying facts are undisputed, we should review the district court's summary judgement ruling as we would review that court's judgment after a bench trial, applying the clearly erroneous standard to the step transaction determination.

■ Whether a lower court's application of the step transaction and related doctrines to undisputed historical facts is an issue of fact or law is a question over which we have struggled.[6] *See, e.g., Sacks v. Commissioner*, 69 F.3d 982, 986 (9th Cir.1995) (noting conflicting authorities). We recently stated, however, that a lower court's "determination that several steps of a complex transaction are, under the step transaction doctrine, a single taxable transaction is a finding of fact subject to the clearly erroneous standard of review." *Custom Chrome v. Commissioner*, 217 F.3d 1117, 1121 (9th Cir.2000).

The second link in the IRS' argument in favor of applying the clearly erroneous standard—that we treat the district court's summary judgment ruling as if it were the result of a bench trial rather than asking whether material fact issues require such a

---

6. Whether we review a tax court decision or a decision of the district court, we apply the

same standard. *Custom Chrome v. Commissioner*, 217 F.3d 1117, 1121 (9th Cir.2000).

trial—is more problematic.[7] We need not, however, resolve the question regarding the proper standard of review at this juncture unless the answer would matter. As it turns out, it would not matter, as we would on this record affirm the district court's summary judgment determination applying a *de novo* standard.

The district court ruled on the marital expense deduction issues after a bench trial. Again, the Estate does not challenge any of the district court's factual findings. We review the court's legal conclusions *de novo*. *Stratosphere Litigation v. Grand Casinos, Inc.*, 298 F.3d 1137, 1142 (9th Cir.2002).

## ANALYSIS

### (A) The Step Transaction

██ The "step-transaction" doctrine collapses "formally distinct steps in an integrated transaction" in order to assess federal tax liability on the basis of a "realistic view of the entire transaction." *Commissioner v. Clark*, 489 U.S. 726, 738, 109 S.Ct. 1455, 103 L.Ed.2d 753 (1989); *accord Custom Chrome*, 217 F.3d at 1127. As such, the doctrine is part of the "broader tax concept that substance should prevail over form." *Associated Wholesale Gro-*

cers, Inc. v. United States*, 927 F.2d 1517, 1521 (10th Cir.1991). Under these principles, the IRS argues, the two transactions which resulted in the payment of gift taxes (gift from Willet to Betty, payment by Betty) should be collapsed into one (payment by Willet).

██ The substance-over-form doctrines are, however, bound by, and in some tension with, the principle, equally lauded in tax law, that "anyone may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose the pattern which will best pay the Treasury." *Grove v. Commissioner*, 490 F.2d 241, 242 (2d Cir.1973). We look to two principles to reconcile these competing concerns.

First, we attempt to distinguish between legitimate "tax avoidance"—actions which, although motivated in part by tax considerations, also have an independent purpose or effect—and illegitimate "tax evasion"—actions which have no, or minimal, purpose or effect beyond tax liabilities. *See Stewart v. Commissioner*, 714 F.2d 977, 987–988 (9th Cir.1983)(citing Bittker, *Pervasive Judicial Doctrines in the Construction of the Internal Revenue Code*, 21 How. L.J. 693, 695 (1978)).[8]

7. *Compare Kearney v. Standard Insurance Co.*, 175 F.3d 1084, 1095 (9th Cir.1999) (en banc) ("trial on the record, even if it consists of no more than the trial judge rereading what he has already read, and making findings of fact and conclusions of law instead of a summary judgment decision, may have real legal significance") (opinion of Kleinfeld, J.) *with Ingram v. Martin Marietta Long Term Disability Income Plan*, 244 F.3d 1109, 1114 (9th Cir. 2001) (remanding for a bench trial, "if confined entirely to the existing record[ ] would be little more than a formality") *and Wolfe v. United States*, 798 F.2d 1241, 1244 n. 2 (9th Cir.1986) *as amended by* 806 F.2d 1410 (9th Cir.1986) (where parties stipulated to pertinent facts, appeal from district court's summary judgment ruling treated as an appeal

from a bench trial, with factual findings reviewed under the clearly erroneous standard).

8. *Stewart* applied the "substance over form" principle rather than expressly invoking the step transaction doctrine. As we have stated, however, the doctrines largely overlap. Indeed, *Stewart* analyzed a situation which is a typical trigger for invocation of the step transaction doctrine: A taxpayer transferred appreciated securities to a corporation he controlled. 714 F.2d at 984. The corporation sold the securities the next day and paid the majority of the proceeds back to the taxpayer. *Id.* at 984–85. We upheld the tax court's determination that the two transactions should be collapsed and treated as if the taxpayer had sold the securities directly. *Id.* at 992.

Second, we scrutinize whether the facts presented "fall within the intended scope of the Internal Revenue provision at issue." *Stewart*, 714 F.2d at 988. This second step is crucial in areas, such as estate planning, in which it is common for Congress to create, and taxpayers to exploit, various tax planning incentives. *See* Jay A. Soled, *Use of Judicial Doctrines in Resolving Transfer Tax Controversies*, 42 B.C. L.Rev. 587, 599, 603–04, 615–16 (2001). For example, § 2513 allowed Willet and Betty, by exercising certain elections, to treat the underlying $3,100,000 gift from Willet to the life insurance trust as if made by both of them, when in reality Willet supplied the entirety of the funds. The IRS has never argued that the substance-over-form doctrine invalidated that election, for obvious reasons: That approach would deny taxpayers the tax benefits intentionally created by the plain language of the Code.[9]

■ Applying these two principles with appropriate caution, we conclude that the two-step transaction between Willet, Betty, and the IRS was properly treated as if Willet had paid the gift taxes directly.

### 1. Betty As A Mere Conduit of Funds

Navigating the murky distinction between "tax avoidance" and "tax evasion" requires careful stewardship. In the context of the step transaction doctrine, however, we have identified a class of cases in which the form of the transaction is particularly suspect. Where a party acts as a "mere conduit" of funds—a fleeting stop in a predetermined voyage toward a particular result—we have readily ignored the role of the intermediary in order appropriately to characterize the transaction. *Ro-*

*bino Inc. Pension Trust v. Commissioner*, 894 F.2d 342, 344 (9th Cir.1990) (where taxpayers sold options on land to two trusts but the trusts acted as mere "conduits" for the ultimate sale to a third party, role of trust disregarded under step transaction doctrine); *Stewart*, 714 F.2d at 991 (where corporation acted as "merely a conduit" for the sale of appreciated securities by the taxpayer, several steps collapsed into one under the substance-over-form principle). *See also Estate of Sachs v. Commissioner*, 856 F.2d 1158, 1163 (8th Cir.1988) (because donor of net gift used donee as a "conduit" to pay taxes, donor deemed to have paid the gift tax).

Viewing the historical facts in the light most favorable to the Estate, it is nonetheless clear that Betty was a "mere conduit" of Willet's funds. The Browns do not advance any argument that the payment to Betty had any purpose or effect other than as a step towards facilitating Willet's payment of the gift tax liability and Betty owned Willet's funds for exactly one day. Betty's fleeting ownership can therefore be disregarded under the principles of *Robino* and *Stewart*.

True, Betty was under no binding commitment to complete the prearranged plan. "Despite intimations to the contrary in the early cases," however, "there is ample authority for linking several prearranged or contemplated steps, even in the absence of a contractual obligation or financial compulsion to follow through." Boris I. Bittker & Martin J. McMahon, Jr., *Fed. Inc. Tax'n of Indiv.* § 1.03[5] (2d. ed.). *See, e.g., Kornfeld v. Commissioner*, 137 F.3d 1231, 1235–1236 (10th Cir.1998); *McDonald's Restaurants v. Commissioner*, 688 F.2d 520, 525 (7th Cir.1982); *Blake v. Commis-*

---

**9.** Section 2513 was enacted to equalize the ability of couples to utilize the gift tax deductions of both spouses whether the couple lived in a community property state or not. *Doerr*

*v. United States*, 819 F.2d 162, 166 (7th Cir. 1987). The equalization effect applies only to gift tax, not to estate tax calculations. *See* note 11 *infra*.

*sioner,* 697 F.2d 473, 481 (2d Cir.1982). Where the two parties to the transaction were sufficiently related or commonly controlled, we have twice applied the step transaction analysis without any finding that the intermediary was legally bound to complete the prearranged plan. *See Robino,* 894 F.2d at 345 (transactions between two taxpayers and trust controlled by taxpayers and spouse of one taxpayer); *Stewart,* 714 F.2d at 984 (transaction between taxpayer and corporation he controlled).

Particularly apt is the Tenth Circuit's analysis in *Kornfeld,* applying the step transaction doctrine where, as here, family members colluded to accomplish a prearranged plan. In *Kornfeld,* the taxpayer, an experienced tax attorney, gave cash payments to his daughters and secretary. 137 F.3d at 1232–33.

The gift recipients then immediately used those funds to purchase remainder interests in bonds. *Id.* The Tenth Circuit determined that the series of transactions should be treated as if the taxpayer had purchased the bonds in fee simple and given the remainder interests to his daughters and secretary (a determination which had negative tax consequences for the taxpayer). *Id.* In so determining, the Tenth Circuit applied a heightened level of skepticism to transactions between related parties. *Id.* at 1235. In addition, the court was swayed by the facts that the "taxpayer [had] stipulated that his intention in making gifts was to enable the donees to make the purchases," and that the donees would be unlikely to flout the taxpayer's intention. *Id.* at 1236. As the court noted, "one does not look a gift horse in the mouth." *Id.*

The same factors which applied in *Kornfeld* apply here: The parties are related, so heightened scrutiny is appropriate. Willet's admitted intention in giving the funds to Betty was to enable her to make the gift tax payments. Finally, Betty was unlikely to flout the desires of her husband because it was she, as the initial beneficiary of the Estate, who stood to gain if the gift tax wager was successful. The two transactions culminating in gift tax payments should therefore be treated as one integrated whole despite the lack of a legally binding commitment.

**2. The End Run Around § 2035**

Our conclusion is reinforced by a consideration of the statute here at issue, § 2035(c)(1993). We begin, in considering that statute, with the Eighth Circuit's analysis of a quite similar situation in *Estate of Sachs v. Commissioner,* 856 F.2d 1158 (8th Cir.1988). In *Sachs,* Samuel Sachs gave stock in trust to his grandchildren within three years of his death. *Id.* at 1159. The gift was structured as a "net gift," meaning that the donees were legally bound to pay the gift taxes otherwise chargeable to the donor. *Id.* Relying in part on the plain language of § 2035, and in part on the substance-over-form doctrine, the Eighth Circuit held that "the gift tax paid under this arrangement is a 'tax paid ... by the decedent or his estate' under § 2035." *Id.* at 1164.

The instant case differs from *Sachs,* however, in that Betty was jointly liable under § 2513(d) to pay the gift tax liability.[10] In comparison, no matter how the beneficiaries in *Sachs* received funds to pay the gift taxes, the gift tax payment was attributable to the donor, if for no

---

**10.** Section 2513(d) states:
If the consent required by subsection (a)(2) [relating to split-gift treatment] is signified with respect to a gift made in any calendar year, the liability with respect to the entire tax imposed by this chapter of each spouse for such year shall be joint and several.

other reason than because only the donor was liable for the debt owed to the IRS. *Id.* at 1163–64.

■■ The question then is whether the Willet–Betty–IRS transaction, though on its face an end-run around § 2035(c)(1993), is nonetheless authorized by § 2513. Had Betty truly paid the gift tax from her own funds, § 2035 would not apply to Betty's payments of the gift tax, because of § 2513.[11] *Id.* at 1165. The Estate argues that because § 2513 authorizes the very "actuarial bet" the couple made, the source of Betty's funds is irrelevant.

The source of the funds *is* pertinent. *Sachs,* 856 F.2d at 1165 (because the gift tax was paid with funds from decedent's estate, fact that gift was split between decedent and his wife under § 2513 did not alter application of § 2035(c)). The language and the history of § 2035(c)(1993) emphasize that this section applies to actual gift tax payments, regardless of the relative gift tax liability among spouses.

First, § 2035(c)(1993) requires that the decedent include in his estate gift taxes "*paid* ... on any gift made by the decedent *or his spouse.*" (Emphasis added). Second, the legislative history states:

> The amount of the gift tax subject to this rule would include tax paid by the decedent or his estate on any gift made by the donor ... It would not, however, include any gift tax paid by the spouse on a gift made by the decedent within three years of death which is treated as made one-half by the spouse [*e.g.,* under § 2513], *since the spouse's payment of such tax would not reduce the decedent's estate at the time of death.*

H. Rep. No. 94–1380, *14, 94th Cong., 2d. Sess. (1976) (emphasis added).

The reason the source of funds matters is that § 2035(c)(1993) was designed to reverse the effect of funds transferred out of an estate within three years of death. If Willet pays the gift tax, it is his net worth that is reduced and therefore his estate that will escape estate tax liability on the funds if he outlives the three-year reach of § 2035(c)(1993). Accordingly, it is his estate that must reverse the effect of the transfer if he dies within the three-year period. Only if Betty pays the gift tax by using her own financial resources is her estate reduced, such that her estate should bear the risk that the payment be included in her estate via § 2035(c)(1993).

By channeling Willet's funds through Betty's estate, the Browns created a transaction sequence in which the tax risk diverged from the economics of the payment. Where one spouse has significantly fewer assets than the other spouse, shifting the risk of § 2035–inclusion onto the estate of the less wealthy spouse, while actually transferring the assets out of the estate of the more wealthy spouse, could have tax evasion advantages for the couple beyond the effect of divergent mortality probabilities: The smaller estate may be subject to lower tax rates, *see* § 2001(c), or to no tax at all, *see* § 2010, so that the inclusion risk does not adequately reverse the effect of the reduction in the larger estate. We do not know whether this was the case in the Brown estate. We note the effect, however, to demonstrate that requiring, as the text and legislative history plainly do, that the § 2035 inclusion risk follow the economics of the gift tax payment is not a pointless formality. Thus, the fact that

---

**11.** Section 2513 applies only for purposes of the gift tax, not for the estate tax. *Estate of Flandreau v. Commissioner,* 994 F.2d 91, 93 n. 1 (2d Cir.1993). As discussed in the text, therefore, the § 2035(c)(1993) liability is not altered by the split-gift election when the decedent in fact pays the gift taxes.

the "actuarial bet" the Browns attempted may have been proper under § 2035 and § 2513 had Betty actually paid the gift taxes does not imply that the Browns' maneuvering here was similarly appropriate.

In *Magneson v. Commissioner*, 753 F.2d 1490, 1497 (9th Cir.1985), we distinguished between a taxpayer's right to choose "[b]etween two equally direct ways of achieving the same result" the method "which entailed the most tax advantages" and the inability to "secure by a series of contrived steps, different tax treatment than if he had carried out the transaction directly." That distinction is illuminating: Had Betty and Willet both had adequate funds with which to pay the gift tax, they would be entitled to choose the most advantageous method from among two equally direct ways of paying the tax (*check from Willet to IRS vs. check from Betty to IRS*). Here however, Willet actually supplied the funds, and Betty's involvement was merely a "contrived step" to secure tax treatment different from that which would have resulted if Willet had paid the IRS directly. The contrived step did not alter the economic reality that Willet paid the tax, and Betty's transient ownership over the funds for one day had no independent purpose or effect beyond the attempt to alter tax liabilities.

**3. Impact of Lack of Certainty of Tax Benefit**

In a variant of its assertion that the actuarial bet was entirely proper, the Estate, noting that the end result of the machinations did not create a *certain* tax advantage, contends that the transaction sequence is therefore immune from the step transaction doctrine. That the tax advantages flowing from Willet's plan were uncertain does not, as the Estate contends, distinguish this case from other instances in which the step transaction or substance over form doctrine has been applied.

For example, in *Sachs*, Samuel Sachs' decision to route gift tax payments through his grandchildren's trust created a tax advantage only because he died within three years of the gift, such that § 2035 would apply if the gift tax payment were attributed to him. Just as Willet's actuarial bet had an uncertain payoff, Sachs' attempt to evade § 2035 could have been rendered useless by subsequent events.

Similarly, in *Robino*, we looked through the form of a transaction even though the choice of form did not create a certain tax advantage. In *Robino*, individuals devised a complicated cross-option scheme, using two trusts as conduits to hold, and ultimately sell, real property. This arrangement "let the taxpayers keep the parcel if it did not appreciate in value but shift the gain on the parcel to the trusts if it did increase in value." 894 F.2d at 345. The real estate market was "volatile" during the relevant time period, *id.* at 343, so a gain on the real property, and therefore the tax advantage of the scheme, was by no means assured. As both *Robino* and *Sachs* therefore demonstrate, a certain tax advantage is not a prerequisite to application of the step transaction doctrine.

Tax consequences aside, the nature of the Browns' transaction sequence (ultimately, a transfer of funds from Willet to the IRS) was fixed the moment Betty wrote out the check to the IRS. Focusing only on Betty's role within that predetermined result, it is clear that her participation had no significance beyond the attempt to alter tax liabilities. Unlike a situation in which Betty paid the gift taxes by reducing her own net worth, a decision with independent economic effect on Betty's estate, Betty's role as a conduit altered the economics of the transaction *only* by shifting the risk of § 2035 inclu-

sion from Willet's estate to Betty's estate. Where, as here, that risk shift did not reflect the reality of the underlying transaction sequence, application of the step transaction is appropriate.

The final component of the Estate's uncertainty argument relates to its complaint that the step transaction doctrine can be, and often is, applied asymmetrically: Had Betty died within three years of the gift tax payments, it is quite unlikely that the IRS would adamantly advocate in favor of treating the funds as if paid by Willet, so as to relieve Betty of the estate tax liability. The IRS's lawyer so indicated at oral argument.

The possibility of a one-way rachet does give us pause. We are not alone: Both courts and commentators have struggled with whether the substance over form principle is a one or two-way street, and whether, even if a two-way street, it nonetheless "run[s] downhill for the Commissioner and uphill for the taxpayer." Bittker & McMahon, *Fed. Inc. Tax'n of Indiv.*, § 1.03 (quoting *Rogers' Estate v. CIR*, 70,-192 P–H Memo. TC (1970), *aff'd* 445 F.2d 1020 (2d Cir.1971)) *but see Clark*, 489 U.S. at 737, 109 S.Ct. 1455 (invoking the doctrine in favor of the taxpayer). *See generally*, William S. Blatt, *Lost On A One–Way Street: The Taxpayers's Ability to Disavow Form*, 70 Or. L.Rev 381 (1991).

Had Betty indeed died first, we would be faced with the difficult question of whether symmetry required application of the step transaction doctrine, or whether the taxpayer, having complete control over the form of the transaction, must bear the consequences of the chosen form without recourse to the step transaction doctrine. Whether the doctrine must be applied

symmetrically is not, however, the issue now before us, and we do not reach it.

## 4. Effect on Estate Planning

The Estate also maintains, somewhat grandiosely, that our holding vitiates the entire estate tax planning profession. For example, notes the Estate, a typical estate planning tool, employed by many parents, involves annual gifts of approximately $10,000 per parent in order to take advantage of the annual gift exclusion of § 2503(b).[12] Because those transactions are also motivated by a desire to avoid estate taxes, the Estate suggests, applying the substance-over-form doctrine to the instant case would require that we apply the substance-over-form doctrine to such annual gift giving and treat the gifts as if they were instead taxable estate transfers.

Rather than supporting the result the Estate favors, the *inter vivos* gift example usefully illustrates the boundaries of the substance-over-form doctrine. When parents elect to make an *inter vivos* gift to their children rather than bequeathing those assets, that decision does have effects independent of the tax consequences: The children receive the funds earlier, and the parent loses control over the assets. In comparison, Betty's ownership over the funds from Willet was transitory. She was simply a conduit, and her role in the transaction was a temporary artifice rather than an event with independent economic significance.

The *inter vivos* gift example differs from the present situation for a second reason as well. The plain language of § 2503(b) reveals that Congress intended to allow, and perhaps to encourage, small annual gifts free of tax, when it enacted § 2503(b). Otherwise, there would not be an annual

---

**12.** Section 2503(b)(1) grants an annual exclusion of $10,000, to be adjusted for inflation as provided in § 2503(b)(2). For tax year 2002, the amount was $11,000. *See* Rev. Proc.2001 59.

dollar exclusion from the gift tax. In stark contrast, § 2035(c)(1993) discourages manipulation of the tax code by large *inter vivos* transfers, by reversing the tax benefits of those transfers. It can hardly be argued that the purpose of § 2035 is advanced by Willet's maneuvering to create the appearance that Betty paid the gift tax when in all practical effect, Willet did so.

### (B) The Marital Deduction

 The Brown estate advances a second theory for relief. The Brown estate spent $3,592,024 on administration expenses (including, *inter alia,* attorneys fees, accounting fees, and legal fees), and is entitled to deduct those amounts from its estate tax return. *See* § 2053(a)(2). The Estate initially estimated that administration expenses would total only $1,712,024, and so only deducted that smaller administration expense amount when it filed its estate tax return. The Estate reasons that it is entitled to increase its § 2053(a)(2) deduction to account for the expenses actually incurred.

The IRS agrees but contends that, to the extent those additional expenses were paid out of funds otherwise earmarked for the marital trust, any increase in the administration expense deduction must be offset by a corresponding decrease in the marital deduction claimed by the Estate. To evaluate that contention, we first examine the principles governing the valuation of the gross estate, the marital deduction, and the administration deduction.

### 1. Calculating Estate Taxes

**Section 2001 of the Internal Revenue Code imposes a** tax on the value of a decedent's property. In calculating the amount owed, the taxpayer first determines the value of the "gross estate." § 2031(a).

From the gross estate, the taxpayer subtracts allowable deductions. Two deductions are relevant for purposes of this appeal: administration expenses, § 2053(a)(2), and amounts left to the surviving spouse, § 2056(a). The marital deduction is limited to "property which passes or has passed from the decedent to his surviving spouse, but only to the extent that such interest is included in determining the value of the gross estate." § 2056(a).[13]

When administration expenses are paid out of funds otherwise earmarked for the corpus of the marital trust, the interplay between the administration deduction and the marital deduction is clear: the larger the administration deduction, the smaller the marital deduction. This is so because funds diverted from the marital trust to pay administration expenses do not "pass" to the surviving spouse. The result also makes good sense: If the estate elects the administration deduction under § 2053(a)(2), the administration expenses are thereby excluded from the taxable estate. § 2051. Including those amounts in the marital deduction as well would create a "double deduction." [14]

13. Section 2056(b)(7) authorizes a full marital deduction even where, as here, the surviving spouse is only an income beneficiary of the trust, with no entitlement to the underlying trust corpus.

14. For the estates of decedents dying after December 2, 1999, the Commissioner's regulations do allow the estate to pay "management expenses attributable to the marital share" out of the corpus of the marital trust without reducing the marital deduction. 26 C.F.R. § 20.2056(b) 4(d). Any other administration expenses, such as transmission expenses (including *inter alia* executors fees and attorneys fees) paid from the marital trust reduce the marital deduction. The new regulations have no bearing on the instant appeal.

The plain language of § 2056(a) therefore supports the IRS position. The Brown estate, however, tries mightily to complicate matters, first by mixing and matching valuation dates, and second by relying on bits of text extracted from *Commissioner v. Estate of Hubert,* 520 U.S. 93, 100, 117 S.Ct. 1124, 137 L.Ed.2d 235 (1997). We are not persuaded.

## 2. Timing and Valuation

The Estate urges us to value the administration expenses at two different times. For purposes of calculating the net estate after expenses and thereby determining the marital deduction, the Estate urges that we use the date-of-death value of the expenses. For purposes of calculating the § 2053(a)(2) deduction, however, the Estate urges a contemporaneous valuation approach. The result of this disparity would be to favor the Estate by allowing an increase in the administration deduction without a corresponding decrease in the marital one.

Valuing an estate for estate-tax purposes does raise difficult timing issues. The executor of an estate may need months, even years, to wind up the affairs of the estate, settle any litigation, and otherwise administer the estate. Between the decedent's death and the actual disbursal of the assets to the heirs, the estate often increases (or decreases) because the underlying assets earn (or lose) income.

■ Typically, the taxpayer values the gross estate according to its value on the date of the decedent's death. § 2031(a).

The value of the property dedicated to any marital trust (and therefore the value of the marital deduction) is also valued as of that date. *Hubert,* 520 U.S. at 100–101, 117 S.Ct. 1124; 26 C.F.R. § 20.2056(b)-(4)(a)(1993).[15] This date-of-death valuation principle has been employed in several other contexts as well. *See, e.g., Ithaca Trust Co. v. United States,* 279 U.S. 151, 154, 49 S.Ct. 291, 73 L.Ed. 647 (1929) (charitable deduction valued at date of death); *Propstra v. United States,* 680 F.2d 1248, 1255 (9th Cir.1982) (deduction for claims against the estate under § 2053(a)(3) valued at date of death).

This early valuation assists the executor in completing the estate tax return and in otherwise moving forward to settle the affairs of the estate. *Cf. Ithaca,* 279 U.S. at 155, 49 S.Ct. 291 ("The first impression is that it is absurd to resort to statistical probability when you know the fact. But this is due to inaccurate thinking. The estate so far as may be is settled as of the date of the testator's death.") Moreover, that the heirs may ultimately receive, estate-tax free, income earned during estate administration can be considered compensation for the delay in receiving the property. *See Hubert,* 520 U.S. at 131, 117 S.Ct. 1124 (Scalia, J., dissenting) (citation omitted). And, in any event, the income earned by the estate is subject to the estate's income tax. *See* § 641(a).

■ Whatever the valuation date, however, it is important to value the gross estate and the various deductions as of the

**15.** The executor can choose, in limited circumstances, an alternate valuation date for the gross estate. § 2032. If the executor chooses such an alternate valuation date, he or she must also account for certain adjustments to the marital deduction. *See* § 2032(b)(2); 26 C.F.R. §§ 20.2056(b) 4(a), 20.2032–1(1993). These alternate provisions are not pertinent to the present appeal.

Although 26 C.F.R. § 20.2056(b) 4 has undergone several revisions since 1993, the mandate in subsection (a) that the marital deduction be valued as of the date of death if the gross estate is so valued has remained consistent.

*same* date. *Hubert,* 520 U.S. at 100–101, 117 S.Ct. 1124 (Kennedy, J., plurality); 26 C.F.R. § 20.2056(b) 4(a)(1993). Otherwise, an estate could value the gross estate property at its lowest point, and the marital and other deductions at their highest points, thereby gaming the resulting tax. Such gaming is, in essence, what the Estate asks this court to condone.

The administration expense deduction is an exception to the date-of-death valuation principle. If the date-of-death principle were employed, the administration expenses would be estimated as soon as practicable after the decedent's death, allowing the estate to quickly finalize its estate tax return. The gross estate would then be reduced by the expected value of the deduction and, if the expenses were to be paid out of funds otherwise earmarked for the corpus of the marital trust, the marital deduction would be reduced accordingly. Under this estimation method, an estate choosing to pay administration expenses out of funds otherwise earmarked for the marital trust would have no incentive to either under or overestimate. If, for example, actual expenses turned out to be more than anticipated, the estate, though it would not have benefitted from the full value of the administration deduction, would have over-estimated by a corresponding amount the funds earmarked for the marital trust, resulting in an offsetting benefit.[16]

But the IRS has adopted a different approach with respect to administration expenses. The estate may only deduct those expenses "*actually* and necessarily incurred." 26 C.F.R. 20.2053–3(a) (emphasis added).[17]

The Estate argues, correctly, that it is therefore entitled to deduct from the gross estate the amount of *actual* administration expenses. In the same breath, it further contends, incorrectly in our view, that because the marital deduction is frozen at its date-of-death value, the Estate need only reduce the marital deduction to account for marital-trust funds earmarked to pay *estimated* administration expenses.

The administration expense exception to date-of-death valuation is a two-way, not a one-way, street. Because the actual, rather than expected, expenses are deducted from the gross estate (despite the usual rule that gross estate valuation is fixed at death), it follows that when those expenses are paid out of the marital trust corpus, the value of the marital trust should be reduced by the actual, rather than expected, expenses (despite the usual valuation rule). Otherwise, an estate would receive a double deduction where, as here, a taxpayer underestimates expenses, creating an incentive to do exactly that. Perhaps for this reason, the Seventh Circuit has implicitly, although not expressly, concluded that when administration expenses are paid out of marital trust property, the result is a *pro tanto* reduction in the marital deduction. *Martin v. United States,* 923 F.2d 504, 505 (7th Cir.1991).

▇▇▇ For the reasons stated, coupled with the fact, discussed below, that the

---

**16.** The analysis might be more complicated, of course, for an estate that chose to pay administration expenses not from the marital trust property but rather from another source.

**17.** When expenses are not yet known by the date of the estate tax filing, the estate can file an estate tax return based on estimated values. 26 C.F.R. 20.2053–1(b)(3). But the Es-

tate asserts, and the Commissioner does not contest, that the estate can subsequently amend the return to account for actual expenses incurred. Indeed, by limiting the deduction to expenses "actually and necessarily incurred", 26 C.F.R.2053 3(a) suggests that the estate might have a duty to amend its estate tax return in this manner.

only authority on which the Estate relies supports our conclusion, we hold that § 2056 requires that, when actual administration expenses are both deducted under § 2053(a)(2) and paid out of funds otherwise earmarked for the marital trust corpus, the marital deduction must reflect the actual amount of funds so diverted.

### 3. *Commissioner v. Estate of Hubert,* 520 U.S. 93, 117 S.Ct. 1124 (1997)

*Hubert* confronted an issue related to but different from the question presented by this appeal. That case concerned whether and how the marital deduction must be reduced when administration expenses were paid out of the *income* earned by the marital trust during estate administration, rather than from the marital trust corpus, and deducted from the estate's income tax, rather than the estate tax, return.[18]

Although that issue splintered the court, all justices recognized as established and accepted in their reasoning the proposition that when administration expenses are paid from the marital trust *corpus,* the result is a *pro tanto* reduction of the marital deduction. The plurality stated:

> The estate did not include in its marital and charitable deductions the amount of residue principal used to pay administration expenses. *The parties here have agreed throughout that the marital or charitable deductions could not include those amounts.* The estate, however, did not reduce the marital or charitable deductions by the amount of the income used to pay the balance of the administration expenses. The Commissioner disagreed and contended that use of income for this purpose required a dollar-

for-dollar reduction of the amounts of the marital and charitable deductions. *Hubert,* 520 U.S. at 99, 117 S.Ct. 1124 (Kennedy, J, plurality) (emphasis added). The concurring opinion also noted:

> *Everyone agrees* that when these expenses are charged against a portion of the estate's principal devised to the spouse or charity, that portion of the principal is diverted from the spouse or charity and the marital and charitable deductions are accordingly reduced by the *actual* amount of expenses incurred.

*Id.* at 112, 117 S.Ct. 1124 (O'Connor, J, concurring) (emphasis added). Justice Scalia's dissent, joined by Justice Breyer, likewise stated:

> Thus, as the plurality correctly recognizes, and as both parties agree, if any portion of marital bequest principal is used to pay estate administration expenses, then the marital deduction must be reduced commensurately.

*Id.* at 123, 117 S.Ct. 1124 (Scalia, J., dissenting). *See also id.* at 136, 117 S.Ct. 1124 ("the key regulation is best read to require that account be taken of *actual* expenses.") (emphasis in original).

True, those statements were not directed at the issue before the Court. Instead, each opinion recited a uniform background assumption against which the more difficult issue of administration payments from income was to be evaluated. While these statements may be dicta under some formulations of that concept, *see United States v. Johnson,* 256 F.3d 895 (9th Cir. 2001) (debating the definition of dicta), several considerations counsel against our treating them as such. The statements were not made "casually and without anal-

---

**18.** The *Hubert* case also considered the interaction between the administration expense deduction and the charitable deduction. The opinion treated the charitable and marital deduction issues interchangeably, however, noting that the same principles guided the analysis of both. 520 U.S. at 100, 117 S.Ct. 1124.

ysis," *Johnson*, 256 F.3d at 915 (Kozinski, J, concurring). Rather, as we will develop, the statements formed part of the "analytical structure of the opinion," *United States v. Crawley*, 837 F.2d 291, 293 (7th Cir.1988). Further, even if dicta, the language is still Supreme Court dicta, and dicta uniform among Justices otherwise very much divided by the case before them.

In light of the Supreme Court's statements in *Hubert*, only the most persuasive argument to the contrary would give us pause. The Estate has presented no such argument. As the district court aptly explained:

> If the Supreme Court's remarks regarding the effect of allocating administrative expenses to estate principal were truly aberrational, the Court would have expected Plaintiffs to provide authority for the contrary proposition. Plaintiffs have failed to do so, and the reason has become apparent to the Court. Taken in context, the comments of the Supreme Court reveal a unanimity on a point that, in all likelihood, is obvious in view of the controlling statute. The beneficiary may take a marital deduction to the extent that property is included in valuing the estate. Reductions in estate principal reduce the value of the estate, which in turn requires an equivalent reduction in the marital deduction. Thus, to ignore the uniform comments of the three opinions as dicta is to ignore the command of the very statute that created the marital deduction in the first place.

*Brown*, 2001 WL 1480293, 88 A.F.T.R.2d.2001–6665 at *11.

The Estate primarily relies on the plurality opinion in *Hubert*. As stated, *Hubert* grappled only with the question whether administration expenses paid from income earned by the marital trust affected the amount of the marital deduction. In answering that question, the plurality opinion first noted that the marital deduction must be reduced to the extent that the obligation to pay administration expenses reduced the date-of-death value of the marital trust property. *Id.* at 100, 117 S.Ct. 1124 (citing § 2056(a)). The question was how to calculate any resulting reduction in value. *Id.*

Relying on regulations then in force, the plurality concluded that the estate need only account for "material" reductions in the anticipated income stream produced by the corpus of the marital trust. *Id.* at 105, 117 S.Ct. 1124 (relying on 26 C.F.R. § 2056(b)4(a) (1996), which stated that "in determining the value of the interest in property passing to the spouse, account must be taken of the effect of any material limitations upon her right to income from the property.") In determining "materiality," the plurality elected to employ a date-of-death valuation method, based on the expected value of future administration expenses.

The Estate argues that this valuation principle applies equally to the present case. Portions of the plurality opinion could be read in isolation to support this approach. *Id.* at 108, 117 S.Ct. 1124 (marital bequest valuation inquiry limited to "facts on the controlling valuation date.") A close look, however, reveals that the plurality's overall reasoning and adoption of the present value approach in *Hubert* cannot extend to the result the Estate seeks in this case.

In determining that its valuation approach would not create a "double deduction," the plurality relied on its observation that income earned by the marital deduction was not separately included in the date-of-death value of the marital property in the first place. *Id.* at 110–111, 117 S.Ct. 1124 ("The marital ... deduction ... do[es] not include income, however. When

income is used ... to pay administration expenses, this does not require that the estate tax deductions be diminished.")

The plurality's conclusion was based on the observation that the marital deduction includes only asset values. *Id.* Those asset values are "determined with reference to expected income." *Id.* Because "only anticipated, not actual, income is included in the gross estate," the plurality reasoned, "only anticipated administration expenses payable from income, not the actual ones, affect the date-of-death value of the ... bequest[ ]." *Id.* at 108, 117 S.Ct. 1124. In other words, as income is only valued through the lens of expected values in the first instance, the plurality reasoned, limitations on income should be valued through that same lens.

Unlike income earned by the marital trust, the underlying assets which form the corpus of the marital trust property are, of course, directly included in the date-of-death value of the marital trust. So the rationale underpinning the plurality's conclusion that its approach created no double deduction cannot extend to the situation in which administration expenses are paid from the trust corpus and the actual amounts paid deducted under § 2053(a)(2), thereby retroactively reducing the estate

date-of-death value. In this case, therefore, "capping" the marital deduction at the "value ... included in determining the value of the gross estate," *id.* at 100–101, 117 S.Ct. 1124, requires that the marital deduction be symmetrically reduced.

Certainly, the plurality's distinction between income and principal was not uniformly accepted. The dissenting justices believed that the distinction was a matter of bookkeeping without economic substance.[19] *Id.* at 133, 117 S.Ct. 1124 (Scalia, J., dissenting); *id.* at 140, 117 S.Ct. 1124 (Breyer, J., dissenting). But those justices advanced that argument in order to *criticize* the plurality's valuation approach, not to extend it. *Id.* at 136, 117 S.Ct. 1124 (Scalia, J., dissenting) ("the key regulation is best read to require that account be taken of *actual* expenses") (emphasis in original); Cf. *id.* at 141, 117 S.Ct. 1124 (Breyer, J., dissenting) (dollar-for-dollar approach may be reasonable).[20] The concurring opinion likewise criticized the plurality's valuation approach, albeit for different reasons. *Id.* at 115–116, 117 S.Ct. 1124 (O'Connor, J., concurring) (stating that expected value principles had "questionable value in this context.").[21]

■ In summary, the concurring and dissenting opinions, representing a majori-

**19.** The Estate goes further, noting that paying administration expenses out of the trust corpus deprives Betty of only the present value of the income which the principal would generate, thereby reducing her income rights *less* than would result from a direct charge to income. As the district court persuasively explained, however, for purposes of the marital deduction, the "property which passes or has passed from the decedent to his surviving spouse" is valued as if it were a transfer in fee even when the spouse is only an income beneficiary. *See Brown,* 2001 WL 1480293, 88 A.F.T.R.2d 2001–6665, *12 (C.D.Cal.2001). When administration expenses are paid out of the marital trust corpus, the marital deduction is reduced not because of Betty's right to income but because of the direct effect on the

value of the underlying assets which comprise the marital trust.

**20.** In their respective dissents, both Justice Scalia and Justice Breyer hinted that although actual, rather than expected, values should be employed to reduce the marital deduction, the actual values should perhaps be discounted to reflect the time value of money. *See id.* at 138, 117 S.Ct. 1124 (Scalia, J. dissenting); *id.* at 141 (Breyer, J. dissenting). As the Brown estate has not advanced this separate argument, we do not reach it.

**21.** The concurring opinion did agree with the plurality on a different point. Focusing on the phrase "account must be taken of the effect of any material limitation upon her

ty of the court, expressly disavowed the valuation approach adopted by the plurality, and the plurality's reasoning does not extend to the case before us. The only authority relied on by the Estate thus contradicts the result it urges. Further, the clear statutory command of § 2056 requires that the marital deduction be reduced *pro tanto* when funds previously earmarked for the marital deduction are spent on administration expenses and deducted under § 2053(a)(2).

### CONCLUSION

For the reasons stated, we **AFFIRM**.

---

right to *income* from the property" found in the applicable regulation, *id.* at 117, 117 S.Ct. 1124 (emphasis added), the concurring opinion agreed that the marital deduction need only be adjusted when the payment of administration expenses was a "material" limitation on income. The ensuing discussion, however, makes clear that the materiality requirement adopted by the concurrence applies only when administration expenses are paid from income:

> Revenue–Ruling 93–48 indicates [the Commissioner's] rejection of the notion that *ev-*ery financial burden on a marital bequest's postmortem *income* is a material limitation warranting a reduction in the marital deduction. That the Ruling purports to apply not only to *income* but also to *principal*, and *may therefore deviate from the accepted rule regarding payment of expenses from principal*, see *supra*, at 1134, does not undercut the relevance of the Ruling's implications as to *income*.

*Id.* at 119, 117 S.Ct. 1124 (emphasis added).